2007-NMSC-047

164 P.3d 31

**FLEETWOOD RETAIL CORPORATION OF NEW MEXICO, a New Mexico corporation, and Fleetwood Retail Corporation, a Delaware corporation, Plaintiffs–Appellants,**

v.

**Alisa LEDOUX, Defendant–Appellee.**

No. 29,737.

Supreme Court of New Mexico.

June 26, 2007.

Rehearing Denied July 27, 2007.

Rodey, Dickason, Sloan, Akin & Robb, P.A., Jeffrey M. Croasdell, Albuquerque, NM, for Appellants.

L. Helen Bennett, P.C., Linda Helen Bennett, Kelley–Streubel, L.L.C., David A. Streubel, Albuquerque, NM, for Appellee.

**OPINION**

BOSSON, Justice.

{1} In *DeVaney v. Thriftway Marketing Corporation*, 1998–NMSC–001, 124 N.M. 512, 953 P.2d 277, we merged the torts of abuse of process and malicious prosecution to create the new tort of malicious abuse of process and allowed defendants to assert malicious abuse of process claims as counterclaims in the underlying proceedings. In the matter before us, Defendant Alisa LeDoux ("LeDoux") brought a malicious abuse of process counterclaim based on lack of probable cause against Plaintiff Fleetwood Retail Corporation ("Fleetwood"), pursuant to *DeVaney*. A jury awarded damages to Fleetwood on some of its underlying claims and also awarded damages to LeDoux on her counterclaim. Fleetwood now appeals the verdict in favor of LeDoux.

{2} The issue we address here is whether recovery by Fleetwood on any single claim provides an absolute defense to a malicious abuse of process action based on lack of probable cause. In making this determination, we decide whether lack of probable cause, one of two alternative theories for a malicious abuse of process action, should be determined as to the complaint as a whole or as to each claim individually. We conclude that the defendant must win the entire case as a condition to proceeding with a malicious abuse of process counterclaim based on lack of probable cause. Because LeDoux was not completely successful in her defense, we reverse the verdict in her favor for malicious abuse of process.

**BACKGROUND**

{3} Fleetwood is in the manufactured housing business and sells its products in New Mexico through Viking Homes. Fleetwood originally brought its complaint in this suit against LeDoux and four other individuals—Grady Henderson, Natasha Moraguez, David Prince, and Caridad Prince. Henderson was employed as Fleetwood's general manager in Albuquerque and was in charge of hiring. Moraguez was Henderson's girlfriend. Caridad Prince is Moraguez's mother and David Prince is Caridad Prince's husband. Henderson hired David and Caridad Prince, and Caridad Prince hired Moraguez. All four were employees of Fleetwood during the time of the incidents at issue in this case.

{4} Alisa LeDoux was a bartender in Albuquerque. Henderson was a frequent customer at LeDoux's place of work, and the two would often converse when LeDoux was bartending. After learning that LeDoux was interested in interior design, Henderson hired LeDoux as an independent contractor to do interior decorating for Fleetwood's mobile homes.

{5} Operating as a sole proprietorship out of her apartment, LeDoux decorated several homes for Fleetwood through January 2001. LeDoux would purchase furniture at Valley Furniture using Henderson's personal account, which Henderson would confirm. LeDoux would then give an invoice to Henderson who would submit a purchase order and payment authorization to Fleetwood. LeDoux would receive a check and reimburse Henderson for the furniture. In January 2001, Henderson abruptly left Fleetwood, and LeDoux never heard from him again.

{6} Around the same time that LeDoux was decorating mobile homes for Fleetwood, David Prince was general manager of Fleetwood's Farmington stores. He and his wife, Caridad, had set up a sham business by the name of "La Empressa" and were using the business to embezzle money from Fleetwood. The Princes would submit both fictitious and legitimate invoices from La Empressa, Fleetwood would pay La Empressa for both the real and non-existent furniture, but La Empressa would not pay the furniture vendors for the furniture actually purchased.

{7} After discovering the fraud, Fleetwood filed suit in federal court against LeDoux and the four other defendants, asserting a RICO racketeering claim as well as state law claims, under the court's supplemental jurisdiction, for fraud and misrepresentation, embezzlement, larceny, conversion, conspiracy, and unjust enrichment. Fleetwood alleged that over $300,000 was embezzled from Fleetwood during the short-lived scheme headed by Henderson. By this time Henderson, Moraguez, and the Princes had all moved out-of-state, and Fleetwood no longer had contact with them. Fleetwood did not contact LeDoux before suing her.

{8} After the RICO suit was filed, LeDoux's counsel attempted to set up a meeting with Fleetwood's director of internal audit, Dennis Christansen, so that LeDoux could explain that she was not involved in the schemes of the other defendants. Although a meeting was set up, Fleetwood's counsel later canceled the meeting and would not reschedule. LeDoux's counsel then wrote a letter to Fleetwood's counsel explaining that Fleetwood's RICO claim was legally deficient because Fleetwood had "failed to allege acts sufficient to meet RICO's pattern requirement or to allege an enterprise distinct from the individual defendants," citing *Duran v. Carris*, 238 F.3d 1268 (10th Cir.2001), and *Switzer v. Coan*, 261 F.3d 985 (10th Cir. 2001), for these contentions. LeDoux's counsel also stated LeDoux's belief that Fleetwood's real motive in bringing the RICO suit against her and refusing to meet with her was to coerce her into providing information and testimony against Henderson. Fleetwood's attorney responded, asserting that the allegations against LeDoux were not made in an attempt to coerce her into providing information about Henderson, and contending that Fleetwood had a justifiable basis for naming LeDoux as a defendant. The letter did not directly refute LeDoux's assertion that the RICO claim was without merit. However, Fleetwood did not dismiss the RICO claim at that time. Three months later, after LeDoux filed a Motion to Dismiss in federal court, Fleetwood voluntarily dismissed the entire suit.

{9} Shortly before the dismissal, but after LeDoux's motion, Fleetwood re-filed in state court against the same defendants, including LeDoux, alleging the same claims under state law that it had in the federal suit. LeDoux counterclaimed for malicious abuse of process, based primarily on the RICO suit which had by then been dismissed. Henderson, Moraguez, and the Princes never appeared at trial and default judgments were entered against them.

{10} At trial, at the end of Fleetwood's case, both parties made motions for judgment as a matter of law on LeDoux's malicious abuse of process counterclaim. The court partially granted LeDoux's motion,

finding as a matter of law that Fleetwood lacked probable cause to file the RICO suit. The court also granted LeDoux's motion for judgment as a matter of law against Fleetwood on its conspiracy claim because there was no evidence of any agreement between LeDoux and the other defendants. We note that it is unclear what happened to the embezzlement, larceny, and unjust enrichment claims, as those claims were not explicitly dismissed. Although the court, near the beginning of its instructions to the jury, stated that "[Fleetwood's] claims were proximately caused by fraud, embezzlement, conversion, larceny, and conspiracy," the jury was instructed only on the elements of fraud and conversion.

{11} With respect to LeDoux's counterclaim for malicious abuse of process, it was undisputed that the costs for LeDoux to defend against Fleetwood's claims in both federal court and state court were $28,431.53, and this amount was presented to the jury without objection as a basis for her compensatory damages. The jury returned a mixed verdict, awarding Fleetwood a judgment in the amount of $8,187.03 on its fraud and conversion claims against LeDoux, and awarding LeDoux a judgment of $28,431.53 on her malicious abuse of process claim against Fleetwood. Although LeDoux elected not to appeal the judgment against her, Fleetwood did appeal from the jury verdict for malicious abuse of process, and in the course of that appeal the Court of Appeals certified two questions to this Court which we discuss below. Before we reach the certified questions, however, we set forth a brief review of *DeVaney* to provide context for our analysis.

### *DeVANEY* AND DEVELOPMENT OF THE MALICIOUS ABUSE OF PROCESS TORT

{12} In *DeVaney*, we created the tort of malicious abuse of process by merging the formerly separate torts of malicious prosecution and abuse of process. 1998–NMSC–001, ¶ 12, 124 N.M. 512, 953 P.2d 277. Malicious abuse of process is "defined by the following elements: (1) the initiation of judicial proceedings against the plaintiff by the defendant; (2) an act by the defendant in the use of process other than such as would be proper in the regular prosecution of the claim; (3) a primary motive by the defendant in misusing the process to accomplish an illegitimate end; and (4) damages." *Id.* ¶ 17. The second element—misuse of process—can be shown in one of two ways: (1) filing a complaint without probable cause, or (2) an "irregularity or impropriety suggesting extortion, delay, or harassment." *Id.* ¶¶ 22, 28. The issues presented by the certified questions turn on this two-pronged element.

{13} Probable cause in the malicious abuse of process context is defined as a "reasonable belief, founded on known facts established after a reasonable pre-filing investigation that a claim can be established to the satisfaction of a court or jury. The lack of probable cause must be manifest." *Id.* ¶ 22 (citations omitted). "[T]he existence of probable cause in the underlying proceeding, that is, whether the facts amount to probable cause, is a question of law and shall be decided by the trial judge." *Weststar Mortgage Corp. v. Jackson*, 2003–NMSC–002, ¶ 17, 133 N.M. 114, 61 P.3d 823 (alteration in original) (quoted authority omitted).

{14} In *DeVaney*, we noted that favorable termination for the plaintiff in the original lawsuit "has significance in demonstrating the existence of probable cause." 1998–NMSC–001, ¶ 23, 124 N.M. 512, 953 P.2d 277. In other words, "[a]n unfavorable termination for the malicious-abuse-of-process plaintiff, meaning some form of recovery for the original-proceeding plaintiff, is conclusive evidence of the existence of probable cause." *Id.* (quoted authority omitted). However, in *DeVaney* we decided that prior favorable termination is not an element of the malicious abuse of process tort, as it was for the former tort of malicious prosecution. Thus, defendants in the underlying action can assert malicious abuse of process claims as counterclaims and are not required to wait until the underlying suit is terminated. *Id.* ¶¶ 23–24.

{15} In allowing malicious abuse of process claims to be brought as counterclaims in the original proceeding, we devised

a two-tiered burden-of-proof system that applies a different burden depending on whether the malicious abuse of process claim was brought as a counterclaim or after termination of the original proceeding. Under *DeVaney*, when a malicious abuse of process claim based on lack of probable cause is brought in a separate proceeding after termination of the original proceeding, a favorable termination for the original plaintiff is an absolute defense to the malicious abuse of process claim. *See id.* ¶ 25. This is because a favorable termination for the original plaintiff is indicative of the existence of probable cause. *Id.* ¶¶ 15, 23. As an element of malicious prosecution, the requirement of a favorable termination served the important function of procedurally safeguarding access to the courts by honest litigants. *Id.* ¶ 25. However, we recognized that if malicious abuse of process claims could be asserted as counterclaims, no favorable termination defense would be available, even though the underlying claims might have merit, and thus there would need to be some other form of safeguard. *Id.* ¶ 26. Therefore, *DeVaney* imposes a higher burden on the malicious abuse of process plaintiff alleging lack of probable cause in a counterclaim, requiring that the lack of probable cause be demonstrated by clear and convincing evidence. *Id.* On the other hand, *DeVaney* held that "[i]f a plaintiff chooses to delay the assertion of a malicious abuse of process claim until the termination of the underlying proceeding, the plaintiff must, instead, prove a lack of probable cause by a preponderance of the evidence." *Id.*

{16} As we have said, under *DeVaney* lack of probable cause is not the only way to establish a misuse of process; that element can also be shown by "some irregularity or impropriety suggesting extortion, delay, or harassment, conduct formerly actionable under the tort of abuse of process." *Id.* ¶ 28. There are two ways of showing a procedural impropriety: (1) a "procedural irregularity" involving misuse of procedural devices such as discovery or (2) "an act that otherwise indicates the wrongful use of proceedings." *Id. DeVaney* does not give much guidance as to which acts indicate a wrongful use of proceedings, beyond listing the following examples: "excessive execution on a judgment; attachment on property other than that involved in the litigation or in an excessive amount; oppressive conduct in connection with the arrest of a person or the seizure of property, such as illegal detention and conversion of personal property pending suit; extortion of excessive sums of money." *Id.* (quoted authority omitted).

{17} Having laid out the basic framework for the improper act element of malicious abuse of process established by *DeVaney*, we now turn to the certified questions.

## CERTIFIED QUESTIONS

{18} The Court of Appeals determined that this appeal raises "issues of substantial public interest" and certified the following questions to us pursuant to Article VI, Section 2 of the New Mexico Constitution and NMSA 1978, Section 34–5–14(C) (1972):

(1) When a [malicious abuse of process] plaintiff relies on lack of probable cause to demonstrate misuse of process, is the lack of probable cause determined as to the underlying complaint generally, or as to each count separately?

(2) Does a verdict for the [original proceeding plaintiff] on one or more counts provide an absolute defense to the [malicious abuse of process] plaintiff's entire . . . claim even though other counts brought by the [original proceeding plaintiff] were brought without probable cause or for an improper purpose and even though the [malicious abuse of process] plaintiff incurred substantial attorney's fees in defending against the non-meritorious claims?

We divide our discussion into two parts because the two types of misuse of process—lack of probable cause and procedural impropriety—require fundamentally different approaches to these questions.

### Lack of Probable Cause

{19} Although the language of *DeVaney* is unclear as to whether trial courts, in determining lack of probable cause, must analyze each claim individually or look to the complaint as a whole, we read that case as more consistent with the latter proposition:

the complaint as a whole. In *DeVaney*, we noted that the malicious abuse of process tort is disfavored in the law "[b]ecause of the potential chilling effect on the right of access to the courts." 1998–NMSC–001, ¶ 19, 124 N.M. 512, 953 P.2d 277; *see also Chittenden Trust Co. v. Marshall*, 146 Vt. 543, 507 A.2d 965, 969 (1986) ("[C]laims of malicious prosecution are not favored in the law . . . because they have an undesirable tendency to unduly discourage citizens from seeking redress in the courts." (quoted authority and alteration omitted)). Favorable termination, as an element of the former malicious prosecution tort, "served the important function of procedurally safeguarding the right of access to the courts by honest litigants," because it limited the malicious prosecution tort to litigants who had actually proven the original lawsuit unsuccessful. *DeVaney*, 1998–NMSC–001, ¶ 25, 124 N.M. 512, 953 P.2d 277. Though *DeVaney* shifted the role of favorable termination from an element to be proven by the malicious abuse of process plaintiff to an absolute defense for the original plaintiff, the inquiry still retains its original function.

{20} Viewing the certified questions with an eye toward protecting honest litigants, we believe that a court's analysis of probable cause should be undertaken in a manner that will likely have the least chilling effect on a litigant's access to the courts. Accordingly, we conclude that probable cause relates to the complaint as a whole, and the original plaintiff need not show favorable termination of each individual claim to establish an effective defense to a subsequent suit for malicious abuse of process. It would be too inhibiting of the right to seek redress in court if plaintiffs had to win on every count or be subject to a malicious abuse of process claim for any count that was unsuccessful. *See, e.g., Teefey v. Cleaves*, 73 S.W.3d 813, 817 (Mo.Ct.App.2002) ("Separate counts in an underlying petition do not support separate actions for malicious prosecution: To allow a party to separate the unsuccessful claims from the successful claims in the underlying proceeding and bring a malicious prosecution action on the unsuccessful ones would invite a multitude of unwarranted litigation . . . ." (quoted authority omitted)).

{21} By allowing "some form of recovery" for the plaintiff in the underlying suit, even though not on all counts, to serve as conclusive evidence of probable cause, we remain true to *DeVaney's* mandate that the malicious abuse of process tort be construed narrowly in favor of the right of access to the courts. *See DeVaney*, 1998–NMSC–001, ¶¶ 19, 23, 124 N.M. 512, 953 P.2d 277. As the Tennessee Supreme Court in *Swepson v. Davis*, 109 Tenn. 99, 70 S.W. 65, 69 (1902), aptly observed in the context of a malicious prosecution case:

> We know of no authority, and have been cited to none, holding that it is necessary for the plaintiff in his original suit to sustain every allegation or charge made in his bill, or else be liable to a suit for malicious prosecution. If this be the correct doctrine, then in every suit for malicious prosecution there must be a separate investigation and retrial of each separate allegation made in the original suit, without reference to the result of the suit as a whole, and the final decree therein. The only sound and tenable rule in cases of malicious prosecution is . . . to settle the question whether the original suit was successfully prosecuted or not by the decree therein upon the final adjudication, and not by the separate allegations and charges, and the proof for and against each.

This rationale recognizes that the litigation process must allow plaintiffs room to frame the issues and make changes in their approach when necessary. We decline to interpret *DeVaney* in a manner that would expose plaintiffs, who are subject to statutes of limitations and have not had the benefit of discovery when deciding what claims to pursue, to malicious abuse of process attacks based on lack of probable cause if it is later determined that one particular claim of several was not supported. Therefore, in answer to the certified questions, lack of probable cause is not a claim-by-claim inquiry, but, rather, is determined as to the lawsuit in its entirety, and any recovery by the original plaintiff will be an absolute defense to a malicious abuse of process claim founded on lack of probable cause.

## Procedural Impropriety

{22} While a finding in favor of the original plaintiff on any single claim may be an absolute defense to a malicious abuse of process claim based on lack of probable cause, the same is not true for claims founded on procedural impropriety. The procedural impropriety theory of misuse of process retains the broader dimensions of the former tort of abuse of process, which recognized that " 'even in meritorious cases the legal process may be abused.' " *Richardson v. Rutherford,* 109 N.M. 495, 502, 787 P.2d 414, 421 (1990) (quoting *Mills County State Bank v. Roure,* 291 N.W.2d 1, 5 (Iowa 1980)). Unlike lack of probable cause, the existence of a procedural impropriety does not depend on the outcome of the underlying suit, and a verdict in favor of the original plaintiff is not dispositive of the procedural impropriety issue. Complaints that assert a multitude of unfounded claims brought in bad faith and for the purpose of harassing a defendant, even though coupled with a valid claim, can constitute a procedural impropriety that will support a malicious abuse of process claim. *See, e.g., id.* Thus, in answer to the certified questions, recovery by the original plaintiff is not an absolute defense to a malicious abuse of process claim founded on a procedural impropriety.

## THE VERDICT IN THIS CASE

{23} Having answered the certified questions, we now apply our holding to the facts of this case, where the jury decided both the underlying claims and the malicious abuse of process counterclaim at the same time, weighing those claims against one another. In line with our holding that lack of probable cause is determined by viewing the lawsuit as a whole, we analyze the federal and state suits together because they differ only in the additional RICO claim asserted in the federal case. The claims all began as a single suit. If presented together, LeDoux's malicious abuse of process counterclaim would have been barred by Fleetwood's partial success on its state claims, regardless of its lack of success on its RICO claim. The only reason for the second lawsuit in state court was the nature of the federal court's limited jurisdiction; once the RICO claim was dismissed, the federal court lost its supplemental jurisdiction over the state claims. If we were to treat these lawsuits separately, as LeDoux asks us to do, we would potentially discourage plaintiffs from seeking relief in federal court for fear that a malicious abuse of process suit will be brought if the claim conferring federal jurisdiction is dismissed. We find no reason to treat a plaintiff who files in federal court differently from one who files in state court.

## Lack of Probable Cause

{24} With regard to the lack of probable cause theory, Fleetwood's recovery on its fraud and conversion claim was an absolute defense to LeDoux's malicious abuse of process counterclaim. Therefore, to the extent that LeDoux's counterclaim was based on lack of probable cause, it must fail. Consequently, to the extent that the jury's verdict in LeDoux's favor was based on the lack of probable cause theory, that verdict must be reversed.

{25} This case highlights some of the challenges inherent in the malicious abuse of process tort when such a claim is based on lack of probable cause and is brought as a counterclaim in the original proceeding. It is unclear exactly what happened below when the court decided the issue of probable cause. When ruling on the motions for judgment as a matter of law, it appears that the court may have intended to rule that only the RICO claim lacked probable cause, a ruling which our holding in this case precludes. Subsequently, the jury was instructed generally that Fleetwood lacked probable cause to initiate judicial proceedings, without any differentiation between the RICO claims and the underlying claims. What is clear, at least, is that the court ruled on lack of probable cause before the underlying claims were decided on their merits. This presents a problem for future cases.

{26} *DeVaney* does not elucidate what happens when, in a malicious abuse of process counterclaim based on a lack of probable cause, the court determines that the malicious abuse of process plaintiff has sustained her burden of demonstrating that the origi-

**158**

nal plaintiff's claims were filed without probable cause. If favorable termination of the underlying suit for the original plaintiff is an absolute defense to a malicious abuse of process claim based on a lack of probable cause, it does not make sense to submit the underlying claims to the jury to be decided on their merits once they have been found by the court to be unsupported by probable cause, and the jury has been so informed. However, a dismissal of such claims based solely on the court's determination that they lacked probable cause when they were filed would effectively take those claims away from the jury. Hindsight now reveals that the reason malicious prosecution actions historically had to await the outcome of the underlying suit was to prevent the ultimate conflict between the court's determination of lack of probable cause and the jury's function in deciding the merits of the underlying claims.

{27} Hindsight also reveals a potential inconsistency in *DeVaney* and some language in that case requiring clarification, lest trial judges read the statement that "probable cause is a question of law" too broadly, as the judge in this case appeared to do. To be sure, if the facts and inferences therefrom are undisputed, probable cause is indeed a question of law. However, it will be a rare case in which both facts and inferences are undisputed, and this case was not such a case. As previously indicated, *DeVaney* contains a discussion of differing burdens of proof depending on whether the malicious abuse of process claim is brought in a separate proceeding or as a counterclaim. It appears at first blush inconsistent to discuss burdens of proof when speaking of questions of law. What *DeVaney* therefore means when it asserts that probable cause is a question of law is that, while the court decides what facts amount to probable cause, when the facts or inferences are disputed, the jury must determine what the facts are before the court can decide the question of law. This reading is consistent with the Restatement view, which points out two ways of determining the issue, either by special verdict on the facts by the jury, on which the court then makes its legal determination, or by instructions to the jury as to what circum-

stances would or would not amount to probable cause. *See* Restatement (Second) of Torts § 673, cmt. e (1977).

{28} This potential inconsistency that hindsight reveals in *DeVaney* goes to the entire question of why differing burdens of proof would even be necessary. If the malicious abuse of process claim is tried as a counterclaim to the underlying claims, then the jury's determination in the original plaintiff's favor on the underlying claims would trump any finding, even by clear and convincing evidence, of a lack of probable cause. It would be only when the original plaintiff loses on the underlying claims that the defendant/counterclaimant would have to prove lack of probable cause. The foregoing discussion touches on some of the challenges only now apparent as effects of our opinion in *DeVaney*.

{29} While we do not attempt to resolve these challenges here, we do offer some suggestions on how to structure the proceedings to make the resolution of malicious abuse of process counterclaims less cumbersome. One way would be to bifurcate the proceedings, having the jury decide the underlying claims first and then, if the verdict is in favor of the original defendant, present the malicious abuse of process counterclaim with the court deciding the ultimate issue of probable cause, if based on undisputed facts and inferences or after the jury has found the facts. Similarly, if the original defendant succeeds on a motion for directed verdict, then the malicious abuse of process counterclaim could go forward. Another way would be to use special verdict forms and jury instructions to the effect that the jury should not reach the malicious abuse of process issues unless it finds in favor of the original defendant on all of the underlying claims. Trial courts and practitioners should use the procedural tools available to them to best structure the proceedings for each particular case.

{30} In any event, it is apparent that there is no real reason for the heightened burden of proof established in *DeVaney*. Whether the parties and the court choose bifurcation or jury instructions to the effect that the malicious abuse of process

counterclaim should only be reached if the jury finds for the defendant on all the underlying claims, it will be clear that the original plaintiff will have lost on its claims before the jury considers the counterclaim. Therefore, the heightened burden of proof established by *DeVaney,* 1998–NMSC–001, ¶ 25, 124 N.M. 512, 953 P.2d 277, is unnecessary. We encourage the UJI Civil Committee to consider revisions to the jury instructions for malicious abuse of process claims that would address the above-mentioned concerns. *Cf. State v. Reed,* 2005–NMSC–031, ¶ 46, 138 N.M. 365, 120 P.3d 447 (directing UJI Criminal Committee "to consider whether an instruction can be formulated that helps the jury understand the function of the phrase 'depraved mind' ").

**Procedural Impropriety**

{31} The question remains whether a procedural impropriety theory can sustain the judgment in LeDoux's favor. At the outset of her case, LeDoux argued this theory as an alternative basis for her malicious abuse of process claim. As we have said, the procedural impropriety theory, unlike the lack of probable cause theory, does not stand or fall on the merits of the underlying claims. Recovery by the original plaintiff does not bar a malicious abuse of process claim founded on a procedural impropriety.

{32} *DeVaney* indicates that the conduct alleged by LeDoux on the part of Fleetwood might, if so found by a jury, constitute a procedural impropriety. LeDoux did not simply allege that Fleetwood initiated the federal and state suits without probable cause; she also alleged that it *maintained* those suits and refused to consider evidence of her innocence without a reasonable belief of the factual allegations against her. There was evidence that Fleetwood cancelled a meeting with LeDoux to discuss her role in the schemes of Fleetwood's employees, and refused to reschedule unless LeDoux had information about the other defendants. With a fuller exposition of the facts, a jury could have found that Fleetwood's actions were similar to an attempt to extort information out of LeDoux. Fleetwood did not dismiss its suit in federal court even after it did

not directly respond to the part of LeDoux's letter alleging that the federal suit was legally and factually insufficient. It was only after LeDoux had expended considerable resources on a motion to dismiss that Fleetwood voluntarily dismissed its federal case. Arguably, this conduct goes beyond the mere filing of a complaint without probable cause and contains acts that could, under the circumstances, rise to the level of a procedural abuse. *See, e.g., DeVaney,* 1998–NMSC–001, ¶ 49, 124 N.M. 512, 953 P.2d 277 (noting that voluntary dismissal, while not improper per se, could rise to the level of a procedural abuse where original plaintiff voluntarily dismissed case after losing a motion to compel discovery, thus supporting an inference that there was no legitimate basis for failure to produce); *Richardson v. Rutherford,* 109 N.M. at 502–03, 787 P.2d at 421–22 (reversing trial court's grant of j.n.o.v. on abuse of process verdict and remanding for new trial where ranch owner brought $3,000,000 lawsuit against former manager on sixty-one counts but could only establish that manager had improperly removed $3,000 worth of timber); *see also Fishman v. Brooks,* 396 Mass. 643, 487 N.E.2d 1377, 1383 (1986) (noting that while groundlessness of suit is not required for abuse of process, original plaintiff's knowledge that his claim was groundless is relevant as tending to show that the process was used for an ulterior purpose).

{33} However, though LeDoux initially based her counterclaim on both lack of probable cause and procedural impropriety, she never requested jury instructions on procedural impropriety as an alternative theory. She therefore waived that theory. It is settled law that if a claim is not presented to the jury it is waived and, as an appellate court, we cannot consider it. *See Haaland v. Baltzley,* 110 N.M. 585, 588, 798 P.2d 186, 189 (1990) (noting that "the theory of the case as submitted to the jury under jury instructions, [becomes] the law of the case, binding upon the parties to the controversy"); *State v. Hurst,* 34 N.M. 447, 449, 283 P. 904, 904 (1929) (holding that a party, having acquiesced in theory of the case as presented by the court's instructions to the jury, cannot, after the verdict, shift his position and change the theory of the case); *Hinger v.*

*Parker & Parsley Petroleum Co.,* 120 N.M. 430, 437–38, 902 P.2d 1033, 1040–41 (Ct.App. 1995) (declining to address theory of strict liability on appeal when case was presented to jury only on theory of negligence).

## CONCLUSION

{34} For the foregoing reasons, we reverse the judgment in favor of LeDoux.

{35} **IT IS SO ORDERED.**

WE CONCUR: EDWARD L. CHÁVEZ, Chief Justice, PATRICIO M. SERNA, and PETRA JIMENEZ MAES, Justices, and LYNN PICKARD, Judge, (sitting by designation).