2007-NMCA-159

173 P.3d 6

Lorna L. SANTILLO, Plaintiff–Appellant,

v.

NEW MEXICO DEPARTMENT OF PUB-
LIC SAFETY, Agent J.W. Carter, and
Agent Todd East, Defendants–Appellees.

No. 26,442.

Court of Appeals of New Mexico.

Oct. 1, 2007.

Certiorari Granted, No. 30,714,
Nov. 20, 2007.

Edmund R. Pitts, Taos, NM, for Appellant.

Long, Pound & Komer, P.A., Mark E. Komer, Santa Fe, NM, for Appellees.

**OPINION**

BUSTAMANTE, Judge.

{1} This case arose out of Plaintiff's arrest on August 3, 2001, for selling alcohol without a license in violation of NMSA 1978, § 60–7A–4.1(A) (1993) (amended 2002). Plaintiff owned a restaurant and pub in Angel Fire, New Mexico. In order to sell alcohol, she was required to have a liquor license, which had to be renewed annually with the Alcohol and Gaming Division of the New Mexico Regulation and Licensing Department (the Division). *See* NMSA 1978, § 60–6B–5 (1998). In 2001 Plaintiff timely applied for

renewal of her license. However, due to a bureaucratic delay, she did not receive her renewal license by June 30, when her current license expired. On August 3, 2001, on a busy Friday evening, officers, knowing that Plaintiff had applied for a license and that her renewal was still being processed, arrested Plaintiff, handcuffed her, and took her to jail, where she was forced to spend the night. Plaintiff then filed this suit, alleging that her arrest and the investigation leading up to it were initiated by an agent of the Special Investigations Division of the New Mexico Department of Public Safety whom Plaintiff believed was "motivated by reasons other than to bring a criminal to justice." The district court granted summary judgment to Defendants, and Plaintiff appeals the district court's orders as to her claims of false imprisonment, false arrest, malicious abuse of process, conversion, and negligent hiring, training, and retention.

{2} Plaintiff's most significant argument is that Defendants lacked probable cause to believe she was selling alcohol without a license. She bases this claim on an interpretation of Section 60–6B–5, which governs the expiration and renewal of liquor licenses. Our interpretation of that statute is dispositive of Plaintiff's false arrest, false imprisonment, and the lack of probable cause portion of her malicious abuse of process claims. We conclude that Plaintiff was in fact in violation of the statute, and that consequently, the officers had probable cause to arrest her. We therefore conclude that summary judgment in favor of Defendants was proper on Plaintiff's claims of false arrest and false imprisonment. We further conclude that although the officers had probable cause to arrest Plaintiff, summary judgment on Plaintiff's claim of malicious abuse of process was erroneously granted in Defendants' favor, in that genuine issue of material fact exist on the issue of impropriety suggesting delay or harassment.

## BACKGROUND

{3} Plaintiff owned Lorna Doone's Restaurant and Black Bear Pub in Angel Fire. The Division first issued Plaintiff a restaurant license to sell beer and wine in 2000. By statute, all licenses expire on June 30 of each year, and may be renewed from year to year. § 60–6B–5. Because her license would expire on June 30, 2000, Plaintiff renewed the license through June 30, 2001.

{4} In April 2001 Plaintiff timely completed the necessary paperwork and paid the fees in order to renew her license for the period of July 1, 2001, through June 30, 2002. Plaintiff fell into neither of the categories in the Division's regulations under which a license will not be renewed, since she did not owe any taxes relating to her license, and since she did not have any unresolved citations issued more than three months prior to the due date of her application. *See* 15.11.22.8(B) NMAC (2001). The check she submitted to the Division to pay the $1100 in fees was cashed. However, as of June 30, 2001, when Plaintiff's license was set to expire, she had not yet received her renewal license. Plaintiff called the Division at least twice in July, and was told that the office was behind in getting the renewal licenses out, but that there was no problem with her license and she could continue to sell alcohol. Someone in the Division told her that her license and a number of other renewal licenses were on deputy director Lillian Martinez's desk waiting to be signed. One of the times Plaintiff called the Division, she spoke with Ms. Martinez, who told Plaintiff there was no problem with her license. Plaintiff could not remember specifically if it was Ms. Martinez who told her she could keep serving alcohol while she was waiting for her renewal.

{5} During the month of July 2001 Agent Jesse Carter of the Special Investigations Division of the New Mexico Department of Public Safety was informed that Plaintiff had an expired license posted at Lorna Doone's. Agent Carter went to the Division to look at Plaintiff's file. He spoke with Debra Lopez, an administrative law judge for the Division, who told him that Plaintiff had not yet been issued a renewal license. A checklist in the file indicated that Plaintiff had met all requirements for renewal of the license, and Division records contained a note stating "Lillian Holding Renewal." Agent Carter was aware that the "Lillian" mentioned in the note was the deputy director of the Division. He did not speak to her to see why she

was holding Plaintiff's renewal. It was clear from the records that Plaintiff's license had not been suspended or revoked. Although Agent Carter claimed that he might have believed that the renewal license had not been issued because of unpaid taxes or because of outstanding citations, the records in Plaintiff's file clearly indicated that no taxes were due and that there were no outstanding citations that would have impeded the renewal of Plaintiff's license.

{6} The next day, Agent Carter put in a request to have another investigator make an undercover purchase of beer in order to gather evidence that Plaintiff was serving alcohol. Agent Carter could not make the undercover purchase himself because he knew Plaintiff personally. On July 10 Agent Todd East went undercover to Lorna Doone's and bought a beer. On July 20 Agent Carter again contacted Ms. Lopez, who faxed him information indicating that the status of Plaintiff's renewal had not changed. Based on his review of the file and his conversations with Ms. Lopez, Agent Carter made preparations to bring a criminal complaint against Plaintiff for the fourth degree felony of selling alcohol without a license.

{7} Agent Carter drafted the documents necessary in order to apply for search and arrest warrants, and had them reviewed by an assistant district attorney. The affidavits he submitted in support of the warrants did not indicate that Plaintiff had timely applied for and met all the requirements for renewal of her license, and instead simply stated that Plaintiff was selling alcohol without a license. On August 3, the day of Plaintiff's arrest, one more undercover purchase was made, and Agent Carter received one more fax from Ms. Lopez indicating that Plaintiff's renewal status had not changed. Based on the information provided by Agent Carter, warrants were issued, and at 8:00 that evening Plaintiff was arrested in front of a crowd of customers at Lorna Doone's, handcuffed, and taken to jail. Plaintiff's stock of beer and wine was seized, along with her business records. Plaintiff asserts that some of her personal property was also taken at that time. The warrant for Plaintiff's arrest did not state that there was an allowable bond (although the judge had not refused to issue a bond), and Agent Carter placed a written notation with an asterisk next to it stating that "Judge did not issue a bond" in the paperwork he completed for processing Plaintiff into jail. Because Plaintiff was arrested on a Friday night when no magistrate was available, she was kept in jail until 10:30 the following evening when her attorney was finally able get a bond set. She received her renewal license a day or two after her release from jail; it had been issued and mailed on August 3, the day of her arrest.

{8} Plaintiff asserted that as a result of her arrest and the disruption it caused to her business, she was forced to close Lorna Doone's and file for bankruptcy. The criminal case against her was ultimately dismissed when the State failed to provide her with a preliminary hearing and when Plaintiff was not given the discovery required under the rules.

{9} Plaintiff filed this Tort Claims Act suit against Agent Carter, Agent East, and the New Mexico Department of Public Safety, among others. Plaintiff testified in her deposition that she believed that Agent Carter arrested her—despite his knowledge that her license had not been suspended or revoked, renewal documents were in order, and the license was about to be renewed—in retaliation against her because she had alerted the FBI to the illegal activities involving drug and firearm trafficking she believed Agent Carter was participating in. Plaintiff had informed her attorney of her suspicions, and her attorney contacted the FBI, telling one of its agents to get in touch with her. The FBI agent never called Plaintiff, and something Agent Carter said to her in the spring of 2001 indicated to Plaintiff that the FBI agent contacted Agent Carter instead. Agent Carter arrived at Lorna Doone's, gave Plaintiff five written warnings for alleged liquor license violations, and told her that the FBI was not going to help her. Plaintiff speculated that this could only mean that Agent Carter knew she had contacted the FBI. Plaintiff's tort claims against Agent Carter were primarily based on his alleged retaliation against her, and her claims

against the other officers and the Department of Public Safety arose for the most part from their alleged contributions to Agent Carter's wrongful conduct.

{10} The district court initially granted partial summary judgment in favor of Defendants on some of Plaintiff's claims and permitted discovery to go forward on others. Ultimately, the district court granted summary judgment in favor of Defendants on all of Plaintiff's claims.

## DISCUSSION

{11} Plaintiff appeals the district court's order granting summary judgment in favor of Agent Carter, Agent East, and the Department of Public Safety on her claims of false imprisonment, false arrest, malicious abuse of process, conversion, and negligent hiring, training, and retention. Summary judgment is appropriate "where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582. We review these legal questions de novo. *Id.* We view the facts in the light most favorable to the party opposing the motion for summary judgment, and we draw all reasonable inferences in support of a trial on the merits. *Handmaker v. Henney*, 1999-NMSC-043, ¶ 18, 128 N.M. 328, 992 P.2d 879.

1. **False Imprisonment, False Arrest, and Malicious Abuse of Process (Probable Cause)**

{12} The parties agree that in order for Plaintiff to prevail on her claims of false imprisonment, false arrest, and malicious abuse of process based on probable cause, she must show that a factual question exists as to whether Agent Carter had probable cause to believe that Plaintiff was unlicensed when she sold alcohol. The tort of false imprisonment occurs when a person intentionally confines or restrains another person without consent and with knowledge that he has no lawful authority to do so. *Diaz v. Lockheed Elecs.*, 95 N.M. 28, 31–32, 618 P.2d 372, 375–76 (Ct.App.1980) (Sutin, J., specially concurring). A false arrest is merely one way of committing false imprisonment. *See* 32 Am.Jur.2d *False Imprisonment* § 3

(2007); *see also Butler ex rel. Butler v. Rio Rancho Pub. Sch. Bd. of Educ.*, 245 F.Supp.2d 1203, 1211 (D.N.M.2002) ("The torts of false arrest and false imprisonment are similar."). An officer who has probable cause to arrest a person cannot be held liable for false arrest or imprisonment, since probable cause provides him with the necessary authority to carry out the arrest. *See State v. Johnson*, 1996-NMSC-075, ¶ 16, 122 N.M. 696, 930 P.2d 1148 (noting that "a common-law defense to a civil . . . false imprisonment suit . . . requires . . . that the officer prove that he or she acted in good faith and with probable cause and therefore lawfully under the circumstances").

{13} Malicious abuse of process occurs when (1) a person initiates judicial proceedings against another, (2) he commits an act in the use of process that would not be proper in the regular process of the claim, (3) a primary motive in misusing the process is to accomplish an illegitimate end, and (4) the person against whom the proceedings are initiated suffers damages. *Fleetwood Retail Corp. of N.M. v. LeDoux*, 2007-NMSC-047, ¶ 12, 142 N.M. 150, 164 P.3d 31; *DeVaney v. Thriftway Mktg. Corp.*, 1998-NMSC-001, ¶ 17, 124 N.M. 512, 953 P.2d 277. The element of an improper act in the use of process can be established by showing that proceedings were initiated without probable cause or by establishing an "irregularity or impropriety suggesting extortion, delay, or harassment." *Fleetwood Retail Corp. of N.M.*, 2007-NMSC-047, ¶ 12; *DeVaney*, 1998-NMSC-001, ¶¶ 21–22. We first consider whether Plaintiff showed that Agent Carter acted without probable cause.

{14} Law enforcement officers have probable cause to arrest a person "when the facts and circumstances within the officers' knowledge, and of which they had reasonably trustworthy information, are sufficient to warrant a man of reasonable caution to believe that an offense has been, or is being, committed." *State v. Duffy*, 1998-NMSC-014, ¶ 69, 126 N.M. 132, 967 P.2d 807 (internal quotation marks and citation omitted). If Agent Carter had probable cause to obtain the warrant for Plaintiff's arrest, then he

acted with authority when he arrested her, and he cannot be held liable for false imprisonment, false arrest, or for malicious abuse of process based on a lack of probable cause. Because we hold that there are no genuine issues of material fact indicating that Agent Carter did not have probable cause to believe Plaintiff was selling alcohol without a license, we affirm summary judgment on these issues.

{15} Plaintiff was arrested for violating the provision of the Liquor Control Act that forbids "any person to sell or attempt to sell alcoholic beverages at any place other than a licensed premises or as otherwise provided by the Liquor Control Act." § 60–7A–4.1(A). Resolution of Plaintiff's claims depends on whether the statute governing the renewal of liquor licenses should be interpreted, as Plaintiff argues, to mean that the license Plaintiff timely applied for in April and received in early August was renewed as a matter of law as of July 1. If that is the proper reading of the statute, then the evidence in this case would raise questions of material fact as to whether Agent Carter had probable cause to believe that Plaintiff was violating the law, since Plaintiff introduced evidence that the Division told her she could continue to serve alcohol and that Agent Carter reviewed Division files indicating that Plaintiff had met all requirements for renewal of her license. These facts would be sufficient to require the question of whether Defendant knew that Plaintiff was licensed—despite the fact that she did not yet have the license in hand—to be submitted to the jury.

{16} Section 60–6B–5 governs the expiration and renewal of liquor licenses. Pursuant to that section:

All licenses provided for in the Liquor Control Act ... shall expire on June 30 of each year and may be renewed from year to year under the rules of the [Division].... The director [of the Division] shall determine whether any of the licensees under his jurisdiction are delinquent in any taxes administered by the taxation and revenue department as of June 1 of each renewal period. The director shall also determine whether or not there exists any other reason why a license should not

be renewed. If the director determines that the license should not be renewed, he shall enter an order requiring the licensee, after notice, to show cause why his license should be renewed, and he shall conduct a hearing on the matter. If, after the hearing, the director finds that the licensee is qualified, he shall renew the license.

*Id.;* *see* NMSA 1978, § 60–3A–3(F) (2001) (amended 2004). The regulations enacted by the Division require that all restaurant renewal applications must be filed by May 1 of each year. 15.11.22.8(A)(2) NMAC. There are two circumstances under which a renewed license will not be issued: First, "when the applicant is delinquent in the payment of any taxes, fees, fines, costs or penalties collected by the state of New Mexico, the liability for which arises out of the exercise of the privilege of a liquor license"; and second, "if citations for violations of the Liquor Control Act issued more than 3 months prior to the filing date for renewal applications are unresolved at the time of filing the renewal application, unless the licensee and the department are involved in a formal administrative or judicial resolution process." 15.11.22.8(B) NMAC. All licensees "who are not issued a renewed license shall suspend all alcoholic beverage operations until such time as a renewed license is issued and displayed on the licensed premises." 15.11.22.8(C) NMAC.

{17} The interpretation of the provisions covering renewal of liquor licenses is a matter of first impression, and we agree with Defendants that Plaintiff was not licensed to serve alcohol during the month of July. In construing the renewal statute, our goal is to identify and effectuate the intent of the legislature. *State v. Smith,* 2004–NMSC–032, ¶ 8, 136 N.M. 372, 98 P.3d 1022. The plain language of the statute is our primary guide to legislative intent, and we will give persuasive weight to any administrative construction of statutes by the agency charged with administering them. *High Ridge Hinkle Joint Venture v. City of Albuquerque,* 1998–NMSC–050, ¶ 5, 126 N.M. 413, 970 P.2d 599. We may also consider the policy implications of the differing constructions urged on us by the parties to this case, as long as we do not second-guess the "clear policy of the Legisla-

ture." *State v. Rivera*, 2004–NMSC–001, ¶ 14, 134 N.M. 768, 82 P.3d 939.

{18} Plaintiff argues that a fair reading of the renewal statute indicates that her license was in effect during the month of July. She claims that when she timely submitted her application and fees, and when neither of the two conditions under which the Division can refuse to renew a license under 15.11.22.8(B) NMAC were met, her license was renewed as a matter of law under Section 60–6B–5. Plaintiff bases her argument on her reading of several characteristics of Section 60–6B–5. First, Plaintiff contends that by law, a renewed license is effective for the twelve-month period from June 30 of each year, since the statute provides that all licenses expire on June 30 and that renewals can be made from "year to year." § 60–6B–5. She points out that the language of the statute indicates that renewal is mandatory if a licensee is qualified for renewal, since it states that if the director of the Division "finds that the licensee is qualified, he *shall* renew the license." *Id.* (emphasis added). Furthermore, if the Division intends to deny a licensee's application for renewal, the director must enter an order requiring the licensee to show cause why her license should be renewed, and must hold a hearing on the matter. *Id.* Plaintiff also looks to a provision of New Mexico's Administrative Procedures Act, which states that "if a licensee has, in accordance with any law and with agency regulations, made timely and sufficient application for a renewal, his license shall not expire until his application has been finally determined by the agency." NMSA 1978, § 12–8–14(A) (1969). Although Plaintiff acknowledges that the Administrative Procedures Act does not control this case, she argues that it expresses a general policy determination that a mere bureaucratic delay in issuing a renewal should not be permitted to interrupt the conduct of a licensee's business.

{19} We cannot agree with Plaintiff's interpretation that her license was renewed as a matter of law as of July 1. The stated legislative policy of the Liquor Control Act is to protect the public health, safety, and morals of the communities in our state.

NMSA 1978, § 60–3A–2(A) (1981). The purpose of New Mexico's liquor control laws is to regulate and place limitations on the sale of alcohol, not to promote it. *See State ex rel. Maloney v. Sierra*, 82 N.M. 125, 135, 477 P.2d 301, 311 (1970). "That policy and any loosening of it, is the business of the legislature, not ours." *Id.* Therefore, when interpreting liquor control legislation, we employ a "liberal interpretation to give effect to legislative purpose and to facilitate temperance." *Thriftway Mktg. Corp. v. State*, 114 N.M. 578, 581, 844 P.2d 828, 831 (Ct.App. 1992).

{20} In order to give effect to the purpose of the Liquor Control Act, we must construe its provisions in the manner that will best ensure that only those who are properly licensed by the Division may sell alcohol. We believe that an interpretation that licenses can be renewed as a matter of law in the absence of any action by the Division to issue the renewal would conflict with that purpose, even under circumstances such as these, where the licensee has met all requirements and is ultimately, but belatedly, issued a renewal. The statutory scheme indicates that the legislature intended for the Division *to take an active role in investigating* whether there is any reason that a licensee should not have her license renewed, and then to *actually renew the license if it concludes that the licensee is qualified*. *See* § 60–6B–5 ("The director shall determine whether any of the licensees under his jurisdiction are delinquent in any taxes. . . . The director shall also determine whether or not there exists any other reason why a license should not be renewed. . . . If . . . the director finds that the licensee is qualified, he shall renew the license."). Active investigation of a restaurant license may take longer than the two-month period between May 1, when licensees are required to submit their applications for renewal, and June 30, when the licensee's license expires, and we are unwilling to say that in such circumstances, the license would be automatically renewed. In Plaintiff's case, there was no evidence that the Division was actually investigating her qualifications to hold the license, and the problem appears to have been a bureaucratic delay. While delays such as the one in this

case may do significant damage to a licensee's business while she is forced to place all alcohol sales on hold, we believe that the remedy for this problem lies with the legislature, and not in an interpretation of the statute that would automatically renew a licensee's license as soon as all requirements for renewal are met.

{21} Because the Division had not yet affirmatively renewed Plaintiff's license, she was not licensed during the month of July. Therefore, based on the facts Agent Carter uncovered during his investigation, he had probable cause to believe Plaintiff was selling alcohol without a license. We express no opinion about whether someone in Plaintiff's position could be held criminally liable under the facts of this case. Because a finding that Defendants had probable cause to believe Plaintiff was not licensed in July would be sufficient to support the warrant for Plaintiff's arrest, we do not reach the question of whether Defendants had probable cause to believe Plaintiff was unlicensed on August 3, the day her license was issued and mailed. The district court properly determined that the officers had probable cause to arrest Plaintiff and properly entered summary judgment against Plaintiff on her claims of false imprisonment and false arrest. With respect to Plaintiff's claim of malicious abuse of process, while the district court was correct on the issue of probable cause, the Court erred in granting summary judgment. As we next discuss, genuine issues of material fact exist in regard to the issue of procedural impropriety.

## 2. Malicious Abuse of Process (Procedural Impropriety)

{22} Plaintiff does not emphasize the procedural impropriety aspect of malicious abuse of process in her briefing, but it is discernible. As our Supreme Court has noted, "the procedural impropriety theory, unlike the lack of probable cause theory, does not stand or fall on the merits of the underlying claims." *Fleetwood Retail Corp. of N.M.*, 2007–NMSC–047, ¶ 31. The procedural impropriety theory "retains the broader dimensions of the former tort of abuse of process, which recognized that even in meritorious cases the legal process may be abused." *Id.* ¶ 22 (internal quotation marks and citation omitted). In the context of this case, the procedural impropriety theory focuses on the question of whether, despite the existence of probable cause, process has been perverted to accomplish an ulterior purpose for which it was not designed, even if properly begun, "has been perverted to accomplish an ulterior purpose for which it was not designed." *Richardson v. Rutherford,* 109 N.M. 495, 501–02, 787 P.2d 414, 420–21 (1990).

{23} Among the types of improprieties recognized to support a claim are acts or failures to act prior to and after filing a complaint that suggest extortion, delay, or harassment. *Fleetwood Retail Corp. of N.M.*, 2007–NMSC–047, *DeVaney*, 1998–NMSC–001, ¶ 28. There is no hint of extortion in our facts, but there are questions of fact as to Agent Carter's purpose to delay or harass.

{24} First, there is the nature and timing of the arrest. Arrests are, almost of necessity, messy situations, but the way it was carried out here raises a question about motive. Was it necessary to arrest and handcuff Plaintiff in front of her customers on a busy Friday night? Was it necessary to confiscate all the money and inventory and all business records on the premises—including correspondence between Plaintiff and her attorney—to effectuate the arrest for this offense when there was ample testimony available from undercover officers to prove sales during the relevant period?

{25} Second: How and why was there no bond set for Plaintiff on the booking document?

{26} Third, the prosecutorial history of the criminal case raises questions of fact about motive. The criminal case was dismissed with prejudice by the district court "for the grounds presented by the Defendant" (Plaintiff). Plaintiff's motion to dismiss the criminal charges asserted two grounds: (1) failure of the State to either hold preliminary hearing or present the case to the grand jury for more than five months after the criminal complaint was filed, and (2) misconduct by the State in that the "case agent had not

submitted any case or evidentiary materials whatsoever to the prosecutor almost five months after filing the case," and therefore the prosecutor could not provide reasonable discovery. At the hearing on the motion, the prosecutor conceded that he had not conducted a timely preliminary hearing, but he also asserted that he had requested and not received case materials from Agent Carter. At his deposition, Agent Carter asserted he had contacted the prosecutor concerning progress on the case and that the prosecutor told him "it had not come up yet." Failure to provide case materials for an extended period of time is analogous to the discovery abuses and voluntary dismissal our Supreme Court found to be problematic—in context—in *DeVaney.* 1998–NMSC–001; *see Pourny v. Maui Police Dep't,* 127 F.Supp.2d 1129, 1153 (D.Hawai'i 2000) (denying summary judgment requested by the defendant because even though there was a valid order, judgment and writ, fact issues existed as to whether the manner of executing the writ was done for primarily improper motives (i.e., putting the plaintiff out of business, or if this was merely an incidental motive)).

{27} Plaintiff claims that Agent Carter's actions were based on improper motivation of revenge. Plaintiff asserts that this improper motivation stemmed from a circumstance in which Plaintiff's attorney contacted the FBI in her behalf and requested that an FBI agent contact Plaintiff to discuss Agent Carter. According to Plaintiff, following that circumstance, Agent Carter gave Plaintiff five citations for alleged liquor license violations, telling Plaintiff not to expect any help from the FBI agent. Plaintiff also asserts that Agent Carter was motivated to punish Plaintiff for her personal belief that Carter was involved in certain illegal activities. While Plaintiff does not particularly stress these allegations, she discusses them sufficiently to require that they be ironed out on remand.

{28} The record thus raises factual issues concerning process from inception to termination. Whether they ultimately are sufficient to prove abuse of process we leave to further litigation and the fact finder on remand.

### 3. Conversion

{29} Plaintiff alleges that Defendants are liable for conversion of personal and business property that was taken from Lorna Doone's on the evening of Plaintiff's arrest. Because Plaintiff, as an individual, does not have standing to sue for harm allegedly done to her corporation as a result of the conversion of its business property, we only address her claim as it relates to her personal property. *See, e.g., Marchman v. NCNB Texas Nat'l Bank,* 120 N.M. 74, 81, 898 P.2d 709, 716 (1995) (stating that even a sole shareholder of a corporation "does not acquire standing to maintain an action in [her] own right ... when the alleged injury is inflicted upon the corporation and the only injury to the shareholder is [an] indirect harm" (internal quotation marks and citation omitted)).

{30} Conversion is "the unlawful exercise of dominion and control over personal property belonging to another in exclusion or defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made." *Nosker v. Trinity Land Co.,* 107 N.M. 333, 337–38, 757 P.2d 803, 807–08 (Ct.App.1988). Plaintiff's claim for conversion of her personal property fails since she has produced no evidence that Defendants ever took possession-wrongful or otherwise-of her personal property. Although Plaintiff alleges that certain of her personal property was seized, Plaintiff was not present during the seizure, and cannot testify as to what occurred. Plaintiff introduced no evidence from anyone present during the seizure that personal, as opposed to corporate, property was taken. Further, she did not introduce any evidence that Defendants had exclusive control of the premises during the period between Plaintiff's arrest and when she discovered the property was missing. No personal property was logged into evidence with the Department of Public Safety, and Agent East testified that everything seized from Lorna Doone's was logged in. Plaintiff came forward with nothing other than her bald assertion to indicate that Defendants ever took possession of her per-

sonal property. Consequently, summary judgment on this claim was appropriate.

### 4. Negligent Hiring, Training, and Retention

{31} Plaintiff asserts that it was the Department of Public Safety's negligent hiring, training, and retention that led its agents and officers to commit torts against her. In the district court, Defendants made purely a legal argument in favor of dismissing this claim. Defendants argued that the negligent hiring and retention could not proceed because there was no predicate tort to support the claim. *Ortiz v. N.M. State Police*, 112 N.M. 249, 251, 814 P.2d 117, 119 (Ct.App.1991) (holding that a cause of action or negligent hiring, training, and retention can proceed only if the alleged negligence leads to the commission of one of the torts enumerated in the Tort Claims Act). The record reveals no factual development on the issue by either party. Since we have reversed as to one cause of action, the district court's apparent basis for granting summary judgment on this claim is no longer viable. We thus reverse on this issue.

### CONCLUSION

{32} We hold that there was probable cause to believe Plaintiff was in violation of the prohibition against selling alcohol without a license. We conclude that Plaintiff does not have standing to raise any claim that the corporation may have had for conversion of business property and that Plaintiff introduced no evidence to support her claim of conversion of her personal property. We reverse as to Plaintiff's malicious abuse of process claim grounded on procedural improprieties as against Agent Carter only. We reverse with regard to Plaintiff's negligent hiring, training, and retention claim for the reason stated. We affirm the district court's order granting summary judgment in favor of Agent East on all claims applicable to him.

{33} **IT IS SO ORDERED.**

I CONCUR: CYNTHIA A. FRY, Judge.

JONATHAN B. SUTIN, Chief Judge (specially concurring).

SUTIN, Chief Judge (specially concurring).

{34} I fully concur. I write separately only to discuss a concern I have about this case that unfortunately was not raised by the parties. The issue not raised is whether, in determining probable cause, the actions of the officer should have been considered in the context of the comprehensive regulatory legislation of the Liquor Control Act. This case is troubling because there was a complete lack of utilization of the regulatory process in enforcing a criminal law enacted as part and parcel of regulatory legislation.

{35} The regulatory scheme for the control of the sale of alcohol is contained in the Liquor Control Act. *See* NMSA 1978, § 60–3A–1 (1984). This is a fairly comprehensive piece of legislation. It covers, among other things, the issuance, denial, suspension, and revocation of licenses, all areas in which law enforcement has no independent authority and must be requested to act by the director of the Alcohol and Gaming Division of the New Mexico Regulation and Licensing Department (the Division). *See* NMSA 1978, §§ 60–3A–6, –7, –8(A) (2001).

{36} When a licensee is qualified, the director must renew licenses being considered for renewal. *See* NMSA 1978, § 60–6B–5 (1998) (stating that if, after a hearing on a show cause notice as to why a license should not be renewed, the director finds that the licensee is qualified, the director is required to renew the license). Section 60–6B–5 requires the director by June 1 to have determined whether the licensee seeking renewal of a license is delinquent in taxes. Further, the director must also determine whether any other reason exists why a license should not be renewed. *Id.* If such a reason exists, the director must initiate a show cause proceeding. *Id.*

{37} NMSA 1978, § 60–7A–4.1(A) (1993) is the statute under which Plaintiff was arrested and charged. It reads: "It is unlawful for any person to sell or attempt to sell alcoholic beverages at any place other than a licensed premises or as otherwise provided by the Liquor Control Act." Under NMSA 1978, § 60–4B–4.1(B) (1993), the director of the

Division has the authority to request that law enforcement officers investigate licensees or activities that the director has reasonable cause to believe are in violation of the Liquor Control Act. Further, "[w]henever a person lodges a signed, written complaint with the [Division] alleging that a licensee has violated any of the provisions of the Liquor Control Act ... the director shall request that the department of public safety investigate the complaint." NMSA 1978, § 60–6C–4(A) (1993).

{38} As indicated, license renewal is mandatory if a licensee is qualified. Plaintiff had been issued licenses for previous license years and submitted her completed application and paid her renewal fee for the license year June 30, 2001, to June 30, 2002. The Division file for Plaintiff's license contained a checklist completed on June 6, 2001, showing that everything for renewal was checked off as completed; and there were no deficiencies outstanding. Agent Carter reviewed this file between July 20 and August 3. On three separate occasions, he requested and received from the Division a faxed printout stating "Lillian holding renewal," but giving no explanation. "Lillian" presumably was Lillian Martinez, Deputy Director of the Division. Agent Carter did not discuss the printout with Ms. Martinez. Plaintiff did all she could, short of camping out on the Division's doorstep, to obtain a routine license renewal.

{39} As of June 30, the Division had no legal basis on which to deny renewal. The delay in renewing the license resulted from a problem solely internal to the Division and had nothing to do with Plaintiff or her license. The State offered no ground justifying renewal delay that permitted it to stop Plaintiff from continuing to sell alcoholic beverages. The license was officially renewed on August 3, which, coincidentally, was the same day Agent Carter arrested Plaintiff and shut down her business. The record does not reflect why the license could not have been officially renewed on June 30, other than perhaps the press of Division business.

{40} It appears that the Division knew that official renewal of Plaintiff's license would be delayed beyond June 30. It also appears that the Division knew Plaintiff was selling alcoholic beverages after June 30. Yet the Division did not warn Plaintiff against continuing to sell alcohol, nor did it ask any law enforcement officer to take action against Plaintiff. Plaintiff, in fact, presented evidence that she was told by someone at the Division that she could continue to sell pending renewal. Agent Carter apparently was not aware of this alleged conversation. However, he was well aware of the administrative delay with no indication whatsoever that the Division had concerns about renewal or about Plaintiff continuing to sell pending renewal. I am not aware of anything in the record showing that Agent Carter inquired whether the Division wanted him to take action against Plaintiff.

{41} As far as I can tell, Agent Carter could easily have reported to the director that he had reasonable cause to believe that Plaintiff was in violation of the Act, and could easily have consulted with the director on what action should be taken. Were the director to agree, after ascertaining the status of license renewal and the cause for delay in issuance of a renewal license, the director could then have requested a further investigation, if one were necessary, or could have requested the agent take action against the licensee. Unquestionably in this case, the question of whether Plaintiff was in violation of law could have been discussed and likely resolved. Perhaps the director might even have attempted to discuss the matter with the licensee or have given written notice of a problem or potential violation of the Act, along the same lines as is described in Section 60–6B–5 for a possible non-renewal and in Section 60–6C–4(D) for charges filed against a licensee. Section 60–6B–5 states that:

> If the director determines that the license should not be renewed, he shall enter an order requiring the licensee, after notice, to show cause why his license should be renewed, and he shall conduct a hearing on the matter. If, after the hearing, the director finds that the licensee is qualified, he shall renew the license.

Section 60–6C–4(D) states that "[a]fter charges have been filed, the director shall

issue a signed order for the licensee to appear at a hearing to explain, on the basis of any ground set out in the charge, why the license should not be revoked or suspended or why the licensee should not be fined, or both."

{42} Interestingly, the State relies on a Division regulation, 15.11.22.8(C) NMAC (2001). *See* 15.10.61.1 NMAC (2006). Regulation 15.11.22.8(C) states:

> C. All licensees who fail to renew their licenses or who are not issued a renewed license shall suspend all alcoholic beverage operations until such time as a renewed license is issued and displayed on the licensed premises. A temporary suspension must be obtained if the license ceases to operate for more than ten (10) consecutive days.

My interest in this regulation goes beyond the unanswered question of whether it applies to the circumstances in this case. What is of interest is that the State argues that it applies, which brings the issues here squarely within the regulatory process.

{43} The meaning given to Section 60–6B–5 in the opinion is that it carries out a policy of protecting the public and does not permit under any circumstances a licensee to continue to sell alcoholic beverages without having a renewed license in hand. Were the issue to have been raised in this case, perhaps a conclusion could be drawn that Section 60–6B–5 ought to be interpreted more broadly. It is significant that the sale of alcoholic beverages is the subject of comprehensive regulatory legislation. I cannot believe that the Legislature intended that a business person be arrested and her business shut down as occurred in the present case. Note NMSA 1978, § 60–6B–14 (1988) and NMSA 1978, § 60–6B–15 (1988) regarding canopy licenses. The Legislature specifically mentions what would appear to be competing economic policy, namely, State revenues, avoiding loss of taxes and fee revenues, avoiding loss of many jobs, and promoting a stable business climate. Why would it be all right to punish someone who jumped through all the hoops and satisfied the requirements, by shutting down her business because the Division was backlogged?

{44} An interpretation given to Section 60–6B–5 essentially gives a law enforcement officer probable cause to arrest on July 1 of the year whenever a license has not been formally renewed by June 30, based *solely* on knowledge of only two circumstances: (1) a license submitted for renewal has not yet been officially issued, and (2) the licensee sold alcoholic beverages on July 1. This interpretation permits arrest and business shut down under such circumstances, requiring neither director nor Division involvement in law enforcement's action, nor any Division action to inform the licensee that she may or may not continue to sell after June 30 while the Division delays the renewal because of work overload.

{45} Given the opportunity to engage in an interpretation of the law based on the context of the regulatory scheme, it is arguable that the decision whether the licensee should be permitted to continue to sell while the license is in the hopper be made administratively by the director, pursuant to a regulation. Under such an interpretation, Section 60–6B–5 would not, under the circumstances here, give law enforcement carte blanche to independently take action.

{46} It seems to me that the regulatory investigative process, the status of the regulatory renewal process, and the manner in which the regulatory authority interprets the law should be the important, if not critical considerations, in order to assess whether there is probable cause to believe that a licensee is committing a felony by selling alcoholic beverages while the Division's official renewal is delayed because of its own internal backlog. If serious questions exist in regard to propriety of renewal of a license, at the very least, the licensee should be notified of this and should be notified, as well, in writing whether he or she can continue to sell alcoholic beverages while the questions are cleared up. Whether a licensee can or should be allowed to continue to sell during a delay beyond June 30 should be handled first by regulatory authority and process. Or, the Division should adopt a regulation clearly and specifically barring sale after June 30 under any circumstances

if a license renewal is not in the licensee's hands by June 30.

{47} One final, but important note. What I have discussed in this special concurrence is not something overlooked in the majority opinion. It was not the majority's place to address any of this and the majority did not address any of this because the parties did not make the arguments. However, I felt it necessary to bring out what appears to me to be critical deficiencies in the administrative and law enforcement processes.