**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 15, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

NANODETEX CORPORATION,

      Plaintiff-Counter-Defendant-
      Appellant,

v.

DEFIANT TECHNOLOGIES,

      Defendant-Counter-Claimant-
      Appellee,

SANDIA CORPORATION,

      Defendant-Counter-Claimant,

RONALD MANGINELL; PATRICK
LEWIS; DOUG ADKINS, individuals,

      Defendants,

v.

ANGELO SALAMONE; ALAN P.
SYLWESTER,

      Counter-Defendants-
      Appellants.

No. 08-2123
(D.C. No. 6:05-CV-1041-BB-LAM)
(D.N.M.)

---

**ORDER AND JUDGMENT**[*]

---

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

Before **TACHA**, **TYMKOVICH**, and **GORSUCH**, Circuit Judges.

---

Defiant claims that Nanodetex maliciously abused legal process by filing a meritless lawsuit against it that was really aimed at "tying up" Defiant in litigation so that it could not pursue its business plan and would be forced to merge its business into Nanodetex's. At trial, the jury agreed and awarded Defiant $2,000,001 in damages. Nanodetex now appeals this result. In this diversity dispute, all the matters on appeal before us concern the application of New Mexico state tort law, with Nanodetex arguing centrally that insufficient evidence exists to support the jury's liability verdict and the damages it awarded. Our review of the evidence, however, reveals no such reversible error. The jury's verdict, if not the only possible outcome, represented a reasonably available one in light of the evidence adduced at trial. Our standards of review and system of appeal afford substantial deference to facts found and damages awarded by the jury, and in this case they require us to affirm.

I

A

Sandia Corporation operates the government-owned Sandia National Laboratories for the United States Department of Energy. Sandia's focus is national security, and its mandate includes developing and licensing technology to private companies. One of Sandia's patented devices is the MicroChemLab, a

miniature chemical laboratory used to identify the presence of chemical and biological warfare agents even in very low concentrations. The device is designed for use in places such as subways and airports, where it might be deployed inconspicuously as a sort of early warning device against weapons of mass destruction.

In 2000, Alan Sylwester, Angelo Salamone, Patrick Lewis, and Ronald Manginell, all Sandia employees, began the process of leaving Sandia and forming the company that later became Nanodetex, with plans to exploit the MicroChemLab's commercial potential. This development was perfectly normal at Sandia, which even has a program to encourage such collaborative spin-off ventures. In due course, Nanodetex and Sandia entered into a licensing agreement that allowed Nanodetex to market Sandia's MicroChemLab to commercial (non-governmental) entities.

Soon, though, Nanodetex's founders began quarreling, and Mr. Lewis and Mr. Manginell returned to Sandia, where they resumed working in the division responsible for the MicroChemLab technology. Whether because of this or other developments, the relationship between Sandia and Nanodetex also began to sour about this time. Sandia contended that Nanodetex failed to meet financing requirements and performance milestones required by the parties' licensing agreement. Nanodetex responded in kind, claiming that it was really Sandia who

had breached the parties' agreement, and, in furtherance of this claim, Nanodetex filed a $225 million lawsuit against Sandia in federal district court.

It is here where the events giving rise to our case really begin in earnest. After Nanodetex announced its lawsuit at a press conference, a reporter attending the event asked Mr. Sylwester and Mr. Salamone whether the license rights at issue in Nanodetex's lawsuit were the same rights that a newly-created company, Defiant Technologies, recently acquired from Sandia. The news of Defiant's existence and potential relationship with Sandia was surprising news to Nanodetex. Following this conversion, Mr. Sylwester examined Defiant's website, which seemed to suggest that Defiant indeed had some relationship with Sandia involving MicroChemLab technology. The website identified Mr. Lewis and Mr. Manginell as two of Defiant's founders and made the following claims: "Defiant uses field-proven technology developed at Sandia National Laboratories by the founders"; "Defiant's technology is well proven. We have operated our system continuously for two years in a busy subway without a single false alarm"; and "Defiant's technology was developed by the founders over the course of the past 9 years. . . . The founders of Defiant not only invented much of this technology while at Sandia National Labs, but they have spent the past five years improving the components for production and applying the technology in several fields." App. 1353-54.

Later the same day, Allan Schwartz, a stakeholder in and former lawyer for Nanodetex, called the phone number listed on Defiant's website, which turned out to be the home number of Doug Adkins, one of Defiant's principals. Mr. Schwartz asked Mr. Adkins if he had seen Nanodetex's press conference earlier that day and then predicted that "Defiant would be pulled into this lawsuit that Nanodetex was filing against Sandia if [Adkins] didn't roll [his] company into Nanodetex." App. 1194. Mr. Schwartz suggested that they "could combine the companies and [Mr. Adkins] could take [his] Sandia license and roll it — you know, the IP from that and roll it into the IP that was owned by Nanodetex." *Id.* at 1195. Mr. Adkins declined the offer, stating that he "wasn't interested in going into business with Al [Sylwester] and Angelo [Salamone]" and that Defiant did not have a license with Sandia. *Id.* Mr. Schwartz agreed that Mr. Sylwester and Mr. Salamone were bad businessmen and said that "basically he was going to give them some money to go away." *Id.* He also offered to invest $10 million in Defiant. Mr. Schwartz ended the call by reminding Mr. Adkins that litigation would keep Defiant's technology "tied up for years." *Id.* at 1194.

The following day, Mr. Sylwester and Mr. Salamone consulted Nanodetex's litigation counsel, and Nanodetex's board voted to include claims against Defiant in its preexisting lawsuit against Sandia. Soon thereafter, Nanodetex filed an amended complaint alleging that Defiant had tortiously interfered with its relationship with Sandia and converted Nanodetex's property interest in its license

with Sandia. The amended complaint also included conspiracy claims against Mr. Lewis, Mr. Adkins, and Mr. Manginell.

Defiant replied with various counterclaims against Nanodetex and its principals, Mr. Sylwester and Mr. Salamone. Among other things, Defiant alleged that Nanodetex's suit against it constituted malicious abuse of process and tortious interference. Citing the conversation between Mr. Schwartz and Mr. Adkins, Defiant claimed that Nanodetex's lawsuit amounted to an improper attempt to inhibit Defiant's business opportunities and force Defiant to merge into Nanodetex. Among other things, Defiant noted that, contrary to the contentions in Nanodetex's complaint, it had not secured any license with Sandia allowing it to exploit MicroChemLab technology commercially. Instead, Defiant had only sought to make sales of the technology to the federal government, something it was entirely free to do in light of the fact that Nanodetex's license afforded it rights only to commercial sales, leaving others free to sell Sandia's MicroChemLab technology to governmental entities.

B

Much motion practice and the usual last minute settlement discussions ensued. By the time the district court finished with Nanodetex's and Defiant's competing summary judgment and judgment as a matter of law motions, the jury was left to decide only Defiant's counterclaims for malicious abuse of process and tortious interference. At trial, the jury entered a verdict in favor of Defiant and

awarded it $2,000,001 in damages: $1 million in compensatory damages for the malicious abuse of process claim; $1 in nominal damages for the tortious interference claim; and $1 million in punitive damages. After extensive post-trial motions practice, the district court refused to alter the jury's verdict. Before us, Nanodetex[1] appeals the jury's liability determination, the damages it awarded, and the district court's decision to grant Defiant summary judgment on Nanodetex's tortious interference and conversion claims. We address each of these arguments in turn.

## II

On liability, Nanodetex asks us to overturn the jury's verdict on the malicious abuse of process claim and grant it judgment as a matter of law. It seeks this relief on the ground that the evidence is legally insufficient to sustain a finding of malicious abuse of process under New Mexico law. Under Federal Rule of Civil Procedure 50 and our precedents, however, we may not disturb a jury's verdict unless "the evidence points but one way and is susceptible to no reasonable inferences supporting [the verdict]," while drawing all non-speculative factual inferences in favor of the prevailing party, here Defiant. *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1086 (10th Cir. 2007). Alternatively, Nanodetex seeks a new trial, which we will grant only when the jury's verdict is "clearly, decidedly

---

[1] The only remaining parties participating in this appeal are Nanodetex, Mr. Sylwester, Mr. Salamone, and Defiant. For convenience's sake, we refer to Nanodetex, Mr. Sylwester, and Mr. Salamone collectively as "Nanodetex."

or overwhelmingly against the weight of the evidence." *Escue v. N. Okla. Coll.*, 450 F.3d 1146, 1157 (10th Cir. 2006). These imposing standards accord appropriate respect to the judgment of those who observed the witnesses, heard the testimony, and reviewed the evidence, and thus assure that we do not simply substitute our own judgment, based on review of a cold record, for the judgment of the jury, which was based on much more than that.

Even bearing our standards of review in mind, Nanodetex argues that sufficient legally competent evidence does not exist to support an essential element of New Mexico's malicious abuse of process tort. To assess this argument, we begin by asking what proof this hybrid tort requires. In *DeVaney v. Thriftway Marketing Corp.*, 953 P.2d 277 (N.M. 1997), *abrogated on other grounds by Fleetwood Retail Corp. of N.M. v. LeDoux*, 164 P.3d 31, 39-40 (N.M. 2007), the New Mexico Supreme Court took the unusual, though not unprecedented, step of combining the common law torts of abuse of process and malicious prosecution into a single cause of action called malicious abuse of process. *Id.* at 279. In the court's view, blending these torts made sense given a "commonality in their purpose and their elements." *Devaney*, 953 P.2d at 282. Both torts, the court reasoned, "are designed to offer redress to a plaintiff who has been made the subject of legal process improperly, where the action was wrongfully brought by a defendant merely for the purpose of vexing or injuring the plaintiff, and resulting in damage to his or her personal rights." *Id.* (citing W.

Page Keeton et al., Prosser and Keeton on the Law of Torts § 119, at 870 (5th ed. 1984)).

With this thought in mind, the *DeVaney* court set forth the following elements of its new malicious abuse of process tort: "(1) the initiation of judicial proceedings against the plaintiff by the defendant; (2) an act by the defendant in the use of process other than such as would be proper in the regular prosecution of the claim; (3) a primary motive by the defendant in misusing the process to accomplish an illegitimate end; and (4) damages." *Id.* at 283.[2]

This appeal turns solely on the second, misuse of process, element. According to the New Mexico Supreme Court, misuse of process can be shown in two ways: "(1) filing a complaint without probable cause, or (2) an irregularity or impropriety suggesting extortion, delay, or harassment." *Fleetwood*, 164 P.3d at 35 (internal quotation marks omitted). Defiant proceeded on both of these misuse theories before the jury. Because the case was tried using a general verdict, we do not know which theory the jury adopted and consequently must affirm if legally sufficient evidence exists to support either theory. *Union Pac. R.R. Co. v. Lumbert*, 401 F.2d 699, 701 (10th Cir. 1968) ("In the absence of a pertinent objection to the charge or a request for a specific interrogatory a general verdict is

---

[2] The New Mexico Supreme Court recently eliminated the first of these elements in *Durham v. Guest*, 204 P.3d 19, 26 (N.M. 2009). This development has no bearing on our case, though, because neither party before us contests the first *Devaney* element.

upheld where there is substantial evidence supporting any ground of recovery in favor of an appellee." (internal quotation marks omitted)).

Before us, Defiant argues that, at the very least, sufficient evidence was adduced at trial for a rational fact-finder to conclude it satisfied the second method of establishing a misuse of process. A party's use of process is abusive under this mode of proof if it: "(1) involves a procedural irregularity or a misuse of procedural devices such as discovery, subpoenas, and attachments, or (2) indicates the wrongful use of proceedings, such as an extortion attempt." *Durham*, 204 P.3d at 26. In this context, extortion has been described by the New Mexico courts as the "us[e] [of] the process to put pressure upon the other to compel him to pay a different debt or take some other action or refrain from it." *Guest v. Berardinelli*, 195 P.3d 353, 361 (N.M. Ct. App. 2008). This portion of the misuse of process tort thus "retains the broader dimensions of the former tort of abuse of process," such that even in meritorious cases where probable cause existed in the first instance to support the filing of a claim legal process may be abused. *Fleetwood*, 164 P.3d at 38. At the same time, the New Mexico Supreme Court has recognized that "[m]eaningful access to the courts is a right of fundamental importance in our system of justice," *Devaney*, 953 P.2d at 284, and has directed that courts should avoid "unduly discourag[ing] citizens from seeking redress in the courts" by construing its malicious abuse of process tort too broadly. *Fleetwood*, 164 P.3d at 37 (citation omitted).

- 10 -

The record before us is surely susceptible to competing views. Under the view urged upon us by Nanodetex, it was merely seeking to vindicate property rights it reasonably believed were being infringed. Defiant's website did make mention of technology that Sandia had licensed to Nanodetex, and Defiant's founders had been intimately involved in developing Nanodetex's technology. This, coupled with the reporter's mention of Defiant, led Nanodetex to suspect Defiant had scotched its relationship with Sandia and perhaps even entered a deal with Sandia to market the MicroChemLab technology commercially. On this view of the evidence, Mr. Schwartz's phone call might appear to be an innocent business offer, or even a legitimate settlement offer.

But viewed in the light most favorable to the jury's verdict, the light in which we are obliged to view the evidence, a different reading is rationally possible, even if not ineluctably compelled. In this light, Mr. Schwartz's phone call was a subtle, yet forceful attempt to pressure Defiant into merging with Nanodetex, with the consequence of refusal being costly litigation aimed at "tying up" its business plans for years. On this view, the phone call amounted to a threat that Nanodetex intended to use the legal system as a weapon to frustrate Defiant's business unless it acceded to Nanodetex's merger demand. The short period of time between the reporter's tip and Mr. Schwartz's call to Mr. Adkins suggested that others at Nanodetex, such as Mr. Sylwester or Mr. Salamone, had discussed the matter with Mr. Schwartz. And the fact that Mr. Schwartz had served as

Nanodetex's lawyer and remained a stakeholder and investor in Nanodetex indicated that he was acting on the company's behalf. Further demonstrating that its lawsuit was being used for ulterior business purposes, Nanodetex did not take care with the allegations in its complaint, alleging that Defiant had entered into an agreement with Sandia concerning the commercial exploitation of MicroChemLab technology when it had not. On this view of the facts, Nanodetex's actions reflect the sort of "extortive" use of legal process proscribed in *Durham* and *Guest* — an illicit use of process not for its intended purpose, but as a means to secure an ulterior end. We, of course, readily recognize that this view of the facts is not the only reasonable one available. It may not even be the most likely one. But it is a reasonable one. And out of deference to the jury system, no more than that is required before we are legally obliged to affirm the jury's verdict.

### III

Turning from liability to damages, Nanodetex presents various arguments for reversal, ranging from contesting the admissibility of Defiant's evidence to its legal sufficiency. In what follows, we group these challenges into three essential categories: those concerning evidence of Defiant's governmental sales by the time of trial, its efforts to recoup attorney fees, and its estimates of lost future profits.

### A

Nanodetex contends that the district court improperly admitted evidence of Defiant's sales to the government. The evidence at issue here involves two sales

Defiant made during the course of the parties' litigation. Nanodetex argues that the court should have excluded this evidence as irrelevant, noting that the district court had held the same evidence irrelevant when Nanodetex offered it to show Defiant had succeeded in converting Nanodetex's technology to its own benefit. Defiant responds that the sales are relevant because they established its ability to turn a profit, and therefore support its lost profits damage theory. Defiant also argues that the district court's two evidentiary rulings were entirely consistent.

When it comes to admitting or excluding evidence, we often say that we will not disturb a district court's decision "absent an abuse of discretion." Because this standard recognizes decisions to admit or exclude pieces of evidence necessarily involve an element of *discretion*, it follows implicitly that reasonable minds might come to different conclusions when faced with the same facts. *See Shook v. Bd. of County Comm'rs of County of El Paso*, 543 F.3d 597, 603 (10th Cir. 2008). Recognizing this, "appellate judges do not simply substitute" our discretionary judgment "for the district judge's," *United States v. Hutchinson*, 573 F.3d 1011, 1024 (10th Cir. 2009), but instead "will reverse a district court's determination only if the court exceeded the bounds of the rationally available choices." *Big Sky Network Canada, Ltd. v. Sichuan Provincial Gov't*, 533 F.3d 1183, 1186 (10th Cir. 2008).

We cannot say Nanodetex meets that threshold in this case. With respect to Nanodetex's conversion claim, evidence of Defiant's governmental sales was

irrelevant because Nanodetex's licensing agreement with Sandia only granted it the exclusive right to sell MicroChemLab technology commercially. Evidence that Defiant made sales to the *government* does not speak at all to the question of whether Defiant improperly took for its own use (converted) any of Nanodetex's legal property interests to make *commercial* sales. By contrast, Defiant's government sales do speak to its damages theory. At trial, Defiant argued that Nanodetex's suit caused it to divert time and capital from its government sales efforts to litigation defense. According to Defiant, it would have generated more governmental sales, resulting in increased profits, had it not been forced to defend against Nanodetex's lawsuit. Indeed, under Defiant's malicious abuse of process theory of the case, undermining Defiant's business was the whole point of Nanodetex's suit. To obtain meaningful damages, Defiant thus had to provide evidence that governmental sales were likely, and were likely to be profitable, absent Nanodetex's conduct. Defiant's two extant governmental sales are relevant evidence tending to support both these propositions—that is, tending to show that Defiant was capable of securing governmental sales and profiting from them. It was left to Defiant to show only that, but for Nanodetex's lawsuit, it would have secured more such sales.

B

At trial, Defiant argued that Nanodetex's improper lawsuit cost it not only lost profits, which we discuss below, but also $230,000 in legal fees that, but for

Nanodetex's conduct, Defiant could have invested in business-generating activities. For its part, Nanodetex challenges the legal sufficiency of Defiant's legal fee evidence, seeking both judgment as a matter of law and a new trial on the question.

An insuperable difficulty with Nanodetex's argument emerges, however, even before we can reach its merits. The difficulty arises from the nature of the jury's verdict. Defiant sought $230,000 in legal fees and approximately $1.6 million in lost profits. The jury ultimately issued a general verdict of $1 million. We have no idea, and no way of knowing, whether the jury's verdict included any award for Defiant's claimed legal fees. For all we know, the jury might have awarded $0 in legal fees. Or it might have awarded the full $230,000 Defiant claimed. Or it might have settled on an amount somewhere in between. Because Nanodetex did not seek special interrogatories asking the jury to explain the basis of its award, we are left to speculate about whether and to what degree the award included any provision for Defiant's claimed legal fees. And reverse a jury's verdict based on speculation, of course, we cannot do. General verdicts have a "traditional sanctity" and "will not be upset on the basis of speculation as to the manner in which the jurors arrived at it." *Midwest Underground Storage, Inc. v. Porter*, 717 F.2d 493, 501 (10th Cir. 1983). Put differently, to reverse we first would have to *guess* that the jury's award includes some legal fee component, and this our precedent will not permit: we "will not invalidate a jury verdict on the

basis of plaintiff's guesswork as to the manner in which the jurors arrived at that verdict." *Howard D. Jury, Inc. v. R & G Sloane Mfg. Co.*, 666 F.2d 1348, 1352 (10th Cir. 1981).

C

With respect to Defiant's claim of lost profits, which we can say with certainty that the jury must have awarded to some extent (given that its award exceeded Defiant's claimed legal fees), Nanodetex raises a number of arguments. Two merit our attention here: Nanodetex contests, first, the admissibility and, second, the sufficiency of Patrick Lewis's testimony and the pro forma he prepared outlining the profits Defiant expected to make before it was faced with the distraction and interference generated by Nanodetex's lawsuit.

On the question of admissibility, again, our review is limited to asking whether the district court abused its discretion. And, again, we cannot say Nanodetex clears that high hurdle. While Mr. Lewis is not an accountant, he does have degree in physics and, prior to joining Defiant, he worked at Sandia for 12 years where he invented products and managed a number of substantial projects. As part of his job at Sandia, Mr. Lewis was responsible for predicting technology development costs associated with these projects, much the same sort of task as was required of him in preparing Defiant's pro forma. In developing Defiant's pro forma, moreover, Mr. Lewis consulted with several outside financial experts at Technology Venture Corporation, a company with a track record of assisting start-

ups like Defiant in preparing their financial projections. Mr. Lewis also consulted directly with potential governmental customers about their future purchasing intentions. Notably, too, the pro forma was not originally prepared for litigation, but instead for the company's business purposes. And Defiant's actual, subsequent governmental sales tended to confirm the accuracy of Mr. Lewis's earlier projections. In the district court's words, Mr. Lewis's predictions "proved to be right on the mark."

It is settled law in this circuit and elsewhere that a qualified officer of a company can, in appropriate circumstances, offer evidence on the outfit's likely future profits. *See State Office Sys., Inc. v. Olivetti Corp. of Am.*, 762 F.2d 843, 846 (10th Cir. 1985). It is equally settled that a plaintiff may present lost profit evidence based on his experience and research. *Malloy v. Monahan*, 73 F.3d 1012, 1016 (10th Cir. 1996). And while Mr. Lewis's predictions of future unrealized profits necessarily bear an additional degree of uncertainty given Defiant's status as a start-up, Defiant's whole theory of the case was that Nanodetex's lawsuit prevented it from ever really taking off and generating profits. We have explained that, in cases like this, "it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts." *King & King Enters. v. Champlin Petroleum Co.*, 657 F.2d 1147, 1162 n.1 (10th Cir. 1981) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)). To

be sure, as Nanodetex notes, the facts of Mr. Lewis's situation and those at issue in *Olivetti* or *Malloy* or *King* are not exactly identical. But that's not the question before us. The question is whether the district court's admission of Mr. Lewis's testimony and pro forma fell outside the bounds of the rationally available options before it in light of these and other relevant legal authorities. The record before us does not permit us to say that it did.

When it comes to assessing the legal sufficiency of Defiant's lost profits proof in connection with Nanodetex's request for judgment as a matter of law or a new trial, our review is again channeled rather than plenary. A plaintiff need specify the scope of its claimed lost future profits only with "reasonable certainty," not with fastidious exactitude. *Camino Real Mobile Home Park P'ship v. Wolfe*, 891 P.2d 1190, 1200 (N.M. 1995); *see also Wirth v. Commercial Res., Inc.*, 630 P.2d 292, 296 (N.M. Ct. App. 1981) ("The lack of certainty that will prevent a recovery is uncertainty as to the fact of damages, not as to the amount."), *cert. denied*, 632 P.2d 1181 (N.M. 1981); *Acme Cigarette Servs., Inc. v. Gallegos*, 577 P.2d 885, 888 (N.M. Ct. App. 1978) ("[T]he fact that the profits may not be computed with exact mathematical certainty does not deny a plaintiff the right to submit the issue of damages to the fact finder."). At the same time, of course, there is a balance: the lost profits amount cannot be "based on surmise, conjecture, or speculation." *Mascarenas v. Jaramillo*, 806 P.2d 59 (N.M. 1991). For reasons we've already outlined, whatever faults one might find with Mr.

Lewis's testimony and pro forma, they were better than that, representing a reasonable effort to assess a but-for world, not just something dreamed up or demanded.[3]

## IV

Finally, we turn to Nanodetex's argument that the district court improperly granted Defiant's motion for summary judgment on Nanodetex's claims for tortious interference and conversion. Here, of course, we review all legal questions *de novo*, and we will affirm the district court's decision only if, after viewing all factual inferences in the light most favorable to Nanodetex, there appear no genuine issues of material fact in dispute between the parties. Fed. R. Civ. P. 56(c); *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1262 (10th Cir. 2008).

Nanodetex's tortious interference claim centers on an allegation that Defiant was responsible for helping undo Nanodetex's relationship with Sandia. The district court dismissed this claim as a matter of law because Defiant was not

---

[3] Nanodetex does not argue to us that Defiant's damages are legally unsound on the basis that New Mexico follows the once accepted but now generally rejected rule against new firms recovering for lost profits. *See* 1 Robert L. Dunn, Recovery of Lost Profits § 4.3, at 378 (6th ed. 2005) ("Most recent cases reject the once generally accepted rule that lost profits damages for a new business are not recoverable."). Nanodetex does, however, ask us to grant a new trial on punitive damages if we find Defiant's evidence insufficient to uphold its compensatory damages award, given that the ratio between compensatory and punitive damages will have changed. *See BMW v. Gore*, 517 U.S. 559 (1996). But, because we affirm the full compensatory damages award, Nanodetex's request for a new trial on this ground necessarily falters.

incorporated at the time of the alleged interference. Even assuming Defiant's eventual founders interfered with Nanodetex's license, the court held, their conduct isn't legally chargeable to Defiant.

In reaching its ruling, the district court correctly recited and followed the general rule that corporations are usually exempt from liability for the torts of their promoters or incorporators. *See* 1A William Meade Fletcher, et al., Cyclopedia of the Law of Corporations § 218, at 468 (2002). This rule is meant to protect corporations from liability over which they could exercise no control. Of course, like most rules, this one has its exceptions. So, for example, corporations are usually prevented from retaining the benefits of wrongful conduct while escaping liability for it. *See* In re *Rickel & Assocs., Inc.*, 272 B.R. 74, 95 (Bankr. S.D.N.Y. 2002). As the district court recognized, however, this exception has no application here because no benefit accrued to Defiant from its founders' alleged misconduct. Nanodetex submits that Defiant benefitted from its founders' actions because they gave Defiant the opportunity to negotiate with Sandia for a license to sell MicroChemLab technology to commercial customers, a contractual right that once and properly belonged to Nanodetex. The difficulty with this argument is that Defiant never received any license involving rights formerly belonging to Nanodetex because it never received permission to sell MicroChemLab technology to commercial customers and limited itself to governmental sales. In other words, any *potential* benefit from the negotiations never *actually* materialized: the

founders' actions ultimately did not enable Defiant to do anything it wouldn't have been able to do anyway. Accordingly, as the district court held, the benefit exception is inapplicable.[4]

Nanodetex also argues that the district court erred in granting Defiant's motion for summary judgment on its claim that Defiant converted Nanodetex's licensing rights with Sandia. However, as the district court recognized, Defiant never succeeded to those rights, and an essential component of conversion is that the defendant must exercise *actual* dominion and control over the allegedly converted property. *See Sec. Pac. Fin. Servs. v. Signfilled Corp.*, 956 P.2d 837, 842 (N.M. Ct. App. 1998) ("Conversion is the unlawful exercise of dominion and control over property belonging to another in defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made."). Sandia and Defiant never reached a licensing agreement permitting Defiant to exploit MicroChemLab technology commercially, and neither did Defiant ever attempt to sell Nanodetex-licensed products commercially. As the district court aptly noted, this leaves Nanodetex's claim as "either a claim for conversion that is not yet ripe . . . or [a]s

---

[4] Separately but relatedly, Nanodetex argues that the district court's grant of summary judgment to Defiant on this claim is inconsistent with the court's denial of summary judgment on the same claim against Defiant's founders as individuals. We disagree. For reasons we have outlined, the involvement of these individuals in potentially tortious behavior does not unavoidably mean that Defiant, as a company, engaged in tortious behavior.

an action for attempted conversion," a claim it did not purport to include in its lawsuit.  D. Ct. Order of Sept. 5, 2007, at 8.

The judgment of the district court is affirmed.

ENTERED FOR THE COURT


Neil M. Gorsuch
Circuit Judge