The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: August 29, 2024

**No. S-1-SC-39602**

**NEW MEXICO PUBLIC REGULATION COMMISSION, PUBLIC SERVICE COMPANY OF NEW MEXICO, WESTMORELAND COAL COMPANY,**

Plaintiffs-Respondents,

and

**BHP BILLITON NEW MEXICO COAL, INC.,**

Plaintiff,

v.

**THE NEW MEXICAN, INC.,**

Defendant-Petitioner.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Francis J. Mathew, District Judge**

Peifer, Hanson, Mullins & Baker, P.A.
Charles R. Peifer
Gregory P. Williams
Albuquerque, NM

for Petitioner

Miller Stratvert P.A.
Dylan O'Reilly
Luke A. Salganek
Santa Fe, NM
Richard L. Alvidrez
Albuquerque, NM

for Respondents Public Service Company of New Mexico

**OPINION**

**VARGAS, Justice.**

**I.     INTRODUCTION**

{1}     The First Amendment to the United States Constitution safeguards the right of the people to "petition the Government for a redress of grievances." We here address a question broadly implicating the petition clause as applied in *Cordova v. Cline*, 2017-NMSC-020, 396 P.3d 159.

{2}     This is an appeal from a final judgment dismissing counterclaims asserted by The New Mexican, Inc. (The New Mexican), publisher of the Santa Fe New Mexican, against the Public Service Company of New Mexico (PNM) for malicious abuse of process and other related theories. The New Mexican claimed that PNM filed a frivolous lawsuit seeking to restrain publication of certain documents released by the New Mexico Public Regulation Commission (the PRC) in response to a public records request. The district court concluded that The New Mexican was required to meet the heightened pleading standard imposed by *Cordova*, 2017-NMSC-020, ¶ 30, on claims challenging conduct protected by the First Amendment right to petition. Further concluding that The New Mexican failed to meet *Cordova*'s heightened pleading standard, the district court granted PNM's motion for judgment on the pleadings and dismissed The New Mexican's counterclaims.

{3}     *Cordova*'s heightened pleading standard is premised on the *Noerr-Pennington* doctrine, a body of federal law developed from the United States Supreme Court opinions in *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965); and *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972). *See Cordova*, 2017-NMSC-020, ¶¶ 24-25, 29-30. Under *Noerr-Pennington*, conduct protected by the right to petition is immune from liability under federal antitrust laws unless the conduct is a mere sham because it is "not genuinely aimed at procuring favorable government action." *City of Columbia v. Omni Outdoor Advert. Inc.*, 499 U.S. 365, 380 (1991) (internal quotation marks and citation omitted). In *Cordova*, we concluded that the principles discussed in *Noerr-Pennington* have equal force outside the antitrust context, applying more broadly to shield "those who engage in conduct aimed at influencing the government, including litigation . . . from retaliation provided their conduct is not a sham." *Cordova*, 2017-NMSC-020, ¶ 24; *id.* ¶ 26 (explaining that "federal and state courts have concluded that the *Noerr-Pennington* doctrine is rooted in the First Amendment right to petition and therefore must be applied to all claims implicating that right, not just to antitrust claims") (citation omitted). We therefore held that a plaintiff who sues a defendant for conduct protected under *Noerr-Pennington* must allege specific facts showing that

2

the protected conduct was a sham by being both objectively baseless and pursued with an improper motivation. *Id.* ¶¶ 28-30.

{4}    We now address a threshold question related to our opinion in *Cordova*: Did PNM's filing of a motion to intervene and related injunctive relief against The New Mexican qualify as conduct protected under *Noerr-Pennington* such that The New Mexican was required to meet *Cordova*'s heightened pleading standard? We conclude that PNM's conduct does not qualify for *Noerr-Pennington* protections. Consequently, The New Mexican was not required to meet *Cordova*'s heightened pleading standard, and the district court erred by dismissing The New Mexican's counterclaims against PNM.

{5}    As we clarify herein, *Cordova*'s heightened pleading standard applies to claims challenging conduct aimed at influencing governmental decisionmaking or action. *Cordova*, 2017-NMSC-020, ¶ 24; *see also Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 555-56 (2014) ("Under the *Noerr-Pennington* doctrine . . . defendants are immune from antitrust liability for engaging in conduct (including litigation) aimed at influencing decisionmaking by the government." (citations omitted)). PNM's litigation activities sought only to resolve a private dispute with The New Mexican and did not seek to influence the government. PNM's conduct therefore falls outside of "the rubric of the *Noerr-Pennington*

doctrine." *Cordova*, 2017-NMSC-020, ¶ 26. Because the district court erred by dismissing The New Mexican's counterclaims under *Cordova*, we reverse and remand to the district court with instructions to vacate both the order of dismissal and the final judgment granted in favor of PNM.

## II.    BACKGROUND

{6}    As background to our analysis, we are confronted with a web of procedural history taking place over nine years of litigation. At the hub of this web lie two pleadings—a motion to intervene including an attached proposed complaint-in-intervention and an application for a preliminary injunction—filed by PNM against The New Mexican in a lawsuit originally initiated by the PRC. *See* Motion of Public Service Company of New Mexico to Intervene as a Party Plaintiff, *NMPRC v. The New Mexican*, *Inc.*, D-101-CV-2015-01823 (1st Jud. Dist. Ct. Aug. 7, 2015); PNM's Application for Preliminary Injunction, *NMPRC v. The New Mexican*, *Inc.*, D-101-CV-2015-01823 (1st Jud. Dist. Ct. Aug. 12, 2015). PNM's filing of these pleadings is the conduct at the core of this appeal.

{7}    PNM is a public utility regulated by the PRC. In 2015, PNM was participating in administrative proceedings regarding the partial decommissioning of the San Juan Generating Station, a coal-fired power-generating facility in San Juan County, New Mexico. At one point in the administrative proceedings, a hearing examiner issued

a protective order outlining procedures for marking documents that the parties deemed to be confidential. PNM subsequently submitted documents to the PRC under the protective order. PNM contends that some of these documents contained trade secrets.

{8} A reporter from The Santa Fe New Mexican newspaper sought documents related to the administrative proceedings and submitted a public records request to the PRC under the Inspection of Public Records Act (IPRA), NMSA 1978, § 14-2-1 to -12 (1947, as amended through 2023). In response to this records request, a clerk at the PRC gave the reporter two discs containing documents that the PRC claims were not subject to release under IPRA. After the PRC unsuccessfully sought to negotiate the return of the discs, the PRC filed a lawsuit, seeking a temporary restraining order, a preliminary injunction, and a permanent injunction prohibiting The New Mexican from publishing the documents.[1]

{9} The day after the PRC filed suit, the district court held a telephonic hearing on the PRC's request for a temporary restraining order. After the hearing and on review of preliminary arguments, the district court denied a temporary restraining

---

[1]The PRC has since settled its claims against The New Mexican but remains a party in the case due to concerns by The New Mexican "about preservation [of] its claims against PNM."

order without prejudice. The district court explained that "any person seeking to obtain a court order imposing a prior restraint on the press has a very heavy burden under the constitutions of the United States and of New Mexico." The district court nevertheless delayed final decision on the restraining order pending an additional hearing to be held approximately one week later, noting that additional parties had expressed a desire to intervene in the suit.

{10} Shortly after this hearing, PNM filed a motion to intervene in the PRC's suit as a party-plaintiff and attached a proposed complaint-in-intervention as an exhibit to its motion. In this proposed complaint, PNM requested injunctive relief against The New Mexican, similar to the relief requested by the PRC, as well as attorneys' fees and costs for violations of the Uniform Trade Secrets Act, NMSA 1978, §§ 57-3A-1 to -7 (1989). In their motion, PNM argued that it should be permitted to intervene because it had a proprietary interest in the disclosed documents that the PRC could not adequately represent. PNM also filed an application for preliminary injunction against The New Mexican seeking to enjoin disclosure of its claimed trade

secrets. Two other companies also moved to intervene in the suit, but, for various reasons, these intervenors are no longer parties to this appeal.[2]

{11} Several important developments occurred prior to the district court's additional hearing on the application for a temporary restraining order. The morning of the hearing, The Santa Fe New Mexican published some of the subject documents on its website. The New Mexican also filed an answer and a counterclaim against PNM, the PRC, and the two other intervenors. The New Mexican's counterclaim asserted a claim for malicious abuse of process and several related counterclaims challenging PNM's, the PRC's, and the other intervenors' efforts to enjoin publication of the documents. The New Mexican alleged that, by applying for a restraining order and injunction, PNM, the PRC, and the other intervenors had "asked the court to impose a blatantly unconstitutional prior restraint on the press" that violated "clearly established statutory or constitutional rights which a reasonable person would have known," and had "no valid legal or factual basis for the relief which they seek against The New Mexican."

---

[2]Westmoreland Coal Company filed a notice of discharge in bankruptcy of claims during the pendency of the district court proceedings. BHP Billiton New Mexico Coal, Inc. was dismissed from this appeal after settling with The New Mexican.

7

**{12}** Around the same time that The New Mexican filed its counterclaims, PNM, the PRC, and the other intervenors moved to withdraw from the suit. The district court, however, had nearly simultaneously granted all pending motions to intervene. The motions to withdraw filed by PNM, the PRC, and the other intervenors' became the focus of the district court's hearing. For reasons not relevant to the question presented, the district court would later deny these parties' motions to withdraw. The district court also explained that its previous order denying a temporary restraining order remained in effect.

**{13}** Some time later, PNM joined another intervenor's motion for judgment on the pleadings seeking to dismiss The New Mexican's counterclaims. The motion asserted that The New Mexican's counterclaims arose solely from the intervenor's joining in the PRC's lawsuit against The New Mexican. The motion argued that this conduct was protected under the *Noerr-Pennington* doctrine and therefore The New Mexican was required to meet *Cordova*'s heightened pleading standard. The motion further contended that The New Mexican could not meet *Cordova*'s heightened pleading standard because the district court had granted the intervenor's motion to intervene in the suit, and thus intervention could not be a sham as a matter of law. *See Cordova*, 2017-NMSC-020, ¶ 24 ("[T]hose who engage in conduct aimed at

influencing the government, including litigation, are shielded from retaliation *provided their conduct is not a sham*.") (emphasis added).

{14} The district court held a hearing on the motion for judgment on the pleadings. At that hearing, the district court judge expressed concerns about the scope of *Cordova* and *Noerr-Pennington* as applied to The New Mexican's counterclaims. For example, the district court judge asked whether applying *Cordova*'s heightened pleading standard to all claims premised on a defendant's malicious abuse of process might be contrary to *DeVaney v. Thriftway Mktg. Corp.* 1998-NMSC-001, 124 N.M. 512, 953 P.2d 277, *overruled in part on other grounds by Durham v. Guest*, 2009-NMSC-007, ¶ 36, 145 N.M. 694, 204 P.3d 19, *abrogated in part by Fleetwood Retail Corp. of N.M. v. LeDoux*, 2007-NMSC-047, 142 N.M. 150, 164 P.3d 31. In *DeVaney*, this Court articulated the tort of malicious abuse of process and acknowledged the *Noerr-Pennington* doctrine but did not apply the doctrine to the elements of the tort. 1998-NMSC-001, ¶ 19 n.1. The district court requested briefing addressing the scope of *Cordova* and took the motion under advisement.

{15} Several years later, after a change in the presiding district court judge, PNM reasserted the motion for judgment on the pleadings that it had previously joined and filed a similar motion on its own behalf. After an additional hearing, the district court granted PNM's motion and entered final judgment dismissing all of The New

9

Mexican's counterclaims. The district court did not address the concerns expressed by the prior presiding judge regarding the scope of *Cordova* and *Noerr-Pennington*. Instead, the district court concluded that "by allowing intervention," the prior judge "was required to find that the right or interest [PNM] sought to protect could not otherwise be protected except by intervention." The district court therefore agreed that the court's earlier order allowing intervention "necessarily found that PNM . . . had a legitimate interest to protect implicating the *Noerr-Pennington* doctrine."

{16}    The New Mexican appealed the final judgment to the Court of Appeals. Among other arguments made at the Court of Appeals, The New Mexican argued that the district court had misread *Cordova* and that *Noerr-Pennington* did not abrogate the tort of malicious abuse of process as recognized by *DeVaney*. However, the Court of Appeals did not address this argument. Although the Court of Appeals acknowledged "doubts that the *Noerr-Pennington* doctrine and the heightened pleading standard of *Cordova* are applicable when, as in this case, both parties in question are private entities, and neither are government entities or officials," that court "decline[d] to address" these doubts. *N.M. Pub. Regul. Comm'n v. The New Mexican, Inc.*, A-1-CA-38898, dec. ¶ 5 (N.M. Ct. App. Sep. 7, 2022). Instead, the Court of Appeals resolved to "assume without deciding that the doctrine and the heightened pleading standard apply under such circumstances." *Id.* The Court of

10

Appeals concluded The New Mexican had "presented no argument as to the objective element" of the sham exception to *Noerr-Pennington* and thus had failed to demonstrate error. *Id.* ¶ 6. The Court of Appeals therefore affirmed the district court's dismissal of The New Mexican's counterclaims. *Id.* We granted The New Mexican's petition for writ of certiorari and now reverse the district court and the Court of Appeals.

## III.   STANDARD OF REVIEW

{17}   This Court reviews the district court's grant of a Rule 1-012(C) NMRA motion for judgment on the pleadings de novo. *Glaser v. LeBus*, 2012-NMSC-012, ¶ 8, 276 P.3d 959 ("We review de novo the district court's grant of [a] motion to dismiss and for judgment on the pleadings."). When the district court's decision is based solely upon the matters contained within the pleadings, we treat a motion for judgment on the pleadings like a Rule 1-012(B)(6) NMRA motion to dismiss for failure to state a claim. *Glaser*, 2012-NMSC-012, ¶ 8; *accord Vill. of Angel Fire v. Bd. of Cnty. Comm'rs of Colfax Cnty.*, 2010-NMCA-038, ¶ 5, 148 N.M. 804, 242 P.3d 371 ("We review judgments on the pleadings made pursuant to Rule 1-012(C) . . . according to the same standard as motions for failure to state a claim under Rule 1-012(B)(6)."). "A motion to dismiss . . . tests the legal sufficiency of the complaint, not the factual allegations of the pleadings which, for purposes of

11

ruling on the motion, the court must accept as true." *Herrera v. Quality Pontiac*, 2003-NMSC-018, ¶ 2, 134 N.M. 43, 73 P.3d 181 (internal quotation marks and citation omitted). When reviewing an order dismissing for failure to state a claim, we will "resolve all doubts in favor of sufficiency of the complaint." *Delfino v. Griffo*, 2011-NMSC-015, ¶ 9, 150 N.M. 97, 257 P.3d 917 (internal quotation marks and citation omitted). We will affirm an order dismissing for failure to state a claim "only when it appears that the plaintiff is not entitled to recover under any facts provable under the" claim. *Glaser*, 2012-NMSC-012, ¶ 8 (internal quotation marks and citation omitted).

## IV.   DISCUSSION

{18}   In view of the district court's and the Court of Appeals' disposition of this matter, the parties primarily focused their briefing on the sufficiency of The New Mexican's allegations of sham conduct under *Cordova*'s heightened pleading standard. However, on review of the briefs and record proper, we questioned whether PNM's conduct implicated *Noerr-Pennington* and, accordingly, whether *Cordova*'s heightened pleading standard applied to The New Mexican's counterclaims. Unlike the district court and the Court of Appeals, we are discontent with merely assuming that *Cordova*'s standard applies. We therefore instructed the parties to direct their oral arguments towards addressing the scope of *Noerr-*

12

*Pennington* and *Cordova* as applied to the facts of this appeal. Having considered those arguments, and on further review, we conclude that PNM's conduct does not qualify as conduct protected under *Noerr-Pennington*. Thus, *Cordova*'s heightened pleading standard does not apply to The New Mexican's counterclaims. We therefore do not consider whether The New Mexican sufficiently alleged that PNM's conduct met *Cordova*'s and *Noerr-Pennington*'s sham exception.

**A.     *Cordova* and the *Noerr-Pennington* Doctrine**

{19}     We situate our discussion by summarizing *Cordova* and the federal body of law on which that opinion relies. *Cordova* addressed a lawsuit brought by a Taos County school board member against a group of citizens that had filed a petition seeking to recall the school board member for alleged acts of misfeasance and malfeasance in office. *Cordova*, 2017-NMSC-020, ¶ 3. At the start of the sufficiency hearing, the citizens dismissed the recall effort, preventing the district court from determining whether there was adequate support for the recall process to proceed. *Id.* ¶¶ 4-5. The school board member subsequently filed a complaint against the citizens, asserting claims for malicious abuse of process, civil conspiracy, and prima facie tort on the grounds that the "recall efforts were in furtherance of a personal vendetta as opposed to legitimate claims of malfeasance or misfeasance in office." *Id.* ¶¶ 4, 6.

13

{20}     The citizens contended that the school board member's complaint amounted to a Strategic Litigation Against Public Participation (SLAPP) lawsuit and filed a special motion to dismiss the complaint under New Mexico's Anti-SLAPP statute, NMSA 1978, §§ 38-2-9.1 to -9.2 (2001). *See Cordova*, 2017-NMSC-020, ¶ 7. "SLAPP suits are filed solely for delay, distraction, and to impose litigation costs on activists exercising their constitutional right to petition as guaranteed by the First Amendment." *Id.* ¶ 18 (brackets, ellipses, internal quotation marks, and citation omitted). The Anti-SLAPP statute provides expedited procedures for resolving lawsuits through a special motion to dismiss actions "seeking money damages against a person for conduct or speech undertaken or made in connection with a public hearing or public meeting in a quasi-judicial proceeding before a tribunal or decision-making body of any political subdivision of the state." Section 38-2-9.1(A).

{21}     The district court in *Cordova* found that the citizens' activities in relation to the recall petition were protected under the First Amendment and the Anti-SLAPP statute and thus granted the citizens' special motion to dismiss. 2017-NMSC-020, ¶ 8. The district court's decision was reversed by the Court of Appeals, which determined that the sufficiency hearing on the recall petition was not a "public hearing or public meeting in a quasi-judicial proceeding" protected by the Anti-SLAPP statute. *Id.* ¶ 19; *see also Cordova v. Cline*, 2013-NMCA-083, ¶ 14,

14

308 P.3d 975, *rev'd*, 2017-NMSC-020, ¶ 42. On review, we concluded that the Court of Appeals misconstrued the Anti-SLAPP statute and thus affirmed the district court's dismissal of the school board member's complaint. *Cordova*, 2017-NMSC-020, ¶¶ 2, 42. More specifically, *Cordova* held the Court of Appeals erred by narrowly construing the Anti-SLAPP statute to exclude the citizens' efforts to recall the school board member. *Id.* ¶¶ 18-23. We explained that the Court of Appeals' narrow construction of the term "public meeting" was contrary to the Anti-SLAPP statute's purposes "of protecting [] citizens from lawsuits in retaliation for exercising their right to petition and to participate in quasi-judicial proceedings." *Id.* ¶¶ 19, 22. The Legislature rather "intended to protect all public participation, whether it be in quasi-judicial proceedings or public hearings." *Id.* ¶ 19. Thus, the school board member's complaint against the citizens was properly subject to the Anti-SLAPP statute's special motion to dismiss. *Id.* ¶ 23.

{22}     After concluding that the citizens were entitled to the procedural protections of the Anti-SLAPP statute, *Cordova* next considered whether the citizens' conduct was entitled to substantive protections under *Noerr-Pennington*. *Id.* ¶¶ 23-24. The *Noerr-Pennington* doctrine first took shape in the antitrust context as a rule of statutory construction used to reconcile the federal Sherman Act with the First Amendment right to petition. *Noerr*, 365 U.S. at 139-40; *Pennington*, 381 U.S. at

15

669-72. In its essential form, the doctrine recognizes "[t]he federal antitrust laws also do not regulate the conduct of private individuals in seeking anticompetitive action from the government." *Omni Outdoor*, 499 U.S. at 379-80. However, "[s]ubsequent decisions give weight to the First Amendment right to petition, thus imputing a First Amendment analysis to the doctrine." *Cordova*, 2017-NMSC-020, ¶ 25.

{23} In *Noerr*, an association of truck operators sued several railroad companies alleging an attempt to monopolize the long-distance freight business in violation of the Sherman Act. *Noerr*, 365 U.S. at 129-30. The truckers alleged that the railroads had engaged in a publicity campaign directed at legislators and law enforcement with the purpose of "destroy[ing] the truckers as competitors." *Id.* at 133. The United States Supreme Court held that the railroads' conduct could not give rise to antitrust liability because the Sherman Act "does not apply to mere group solicitation of governmental action." *Id.* at 139. The *Noerr* Court reasoned that construing the Sherman Act to prohibit the railroads' publicity campaign would "deprive the government of a valuable source of information and, at the same time, deprive the people of their right to petition in the very instances in which that right may be of the most importance to them." *Id.* The *Noerr* Court cautioned, however, that the antitrust laws would apply if the "publicity campaign, ostensibly directed toward

influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Id.* at 144.

{24} A few years after *Noerr*, the United States Supreme Court extended antitrust immunity to a union and other companies' efforts to lobby executive branch officials. *Pennington*, 381 U.S. at 660-61. The *Pennington* Court held that the lobbying could not give rise to antitrust liability because "*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." *Id.* at 669-70.

{25} Later, in *Cal. Motor*, the United States Supreme Court extended *Noerr-Pennington* antitrust immunity to the judicial branch, explaining that "the right to petition extends to all departments of the Government." 404 U.S. at 510. *Cal. Motor* involved a dispute between two motor carriers regarding the defendant-carrier's use of "rehearings" and "reviews or appeals from agency or court decisions" to defeat the plaintiff-carrier's applications to acquire operating rights. *Id.* at 509. The *Cal. Motor* Court acknowledged, "The right of access to the courts is indeed but one aspect of the right of petition." *Id.* at 510. Nevertheless, the Court explained that misrepresentations tolerated in politics do not gain immunity when employed in legal proceedings; a pattern of baseless claims can constitute abuse of the judicial

17

and administrative processes, resulting in unlawful outcomes that restrict access to agencies and courts, regardless of claims of political expression. *Id.* at 513. Although the *Cal. Motor* Court concluded that the defendant's conduct—involving concerted efforts to obstruct competitors' access to adjudicatory tribunals through state and federal proceedings—was shielded from general antitrust liability under *Noerr-Pennington* immunity, it held that the plaintiff's specific allegations of using these processes in a deceptive manner satisfied the sham exception to this immunity. *See id.* at 510-11, 515-16.

{26}     Considering this historical context, our opinion in *Cordova* held that the *Noerr-Pennington* doctrine is not limited to the antitrust context, but more broadly shields "those who engage in conduct aimed at influencing the government, including litigation . . . from retaliation provided their conduct is not a sham." *Cordova*, 2017-NMSC-020, ¶ 24. We therefore "consider[ed] the recall activities at issue [in *Cordova*] to fall within the rubric of the *Noerr-Pennington* doctrine." *Id.* ¶ 26. Accordingly, the citizen's recall activities were immune from suit unless the school board member showed that the recall activities were a sham. *Id.* ¶ 27.

{27}     As an additional protection arising from the Anti-SLAPP statute and *Noerr-Pennington*, *Cordova* agreed with the Colorado Supreme Court in *Protect Our Mountain Env't, Inc. v. Dist. Ct. In & For Cty. of Jefferson*, 677 P.2d 1361, 1368-69

(Colo. 1984) (en banc), that the plaintiffs challenging conduct shielded by *Noerr-Pennington* should meet a heightened pleading standard. *Cordova*, 2017-NMSC-020, ¶¶ 29-30. We therefore held that a plaintiff challenging *Noerr-Pennington* protected conduct must plead sufficient facts and law to show that the protected conduct was both "objectively baseless in that it did not have sufficient factual or legal support" and subjectively pursued with an improper motivation. *Id.* ¶¶ 28, 30; *see also Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993) (defining "sham litigation" as "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and subjectively "an attempt to interfere directly with the business relationships of a competitor through the use of the governmental process . . . as an anticompetitive weapon" (emphasis, brackets, internal quotation marks, and citations omitted)). Concluding that the school board member had failed to meet the subjective element of this two-part standard, *Cordova* affirmed the dismissal of the school board member's complaint. 2017-NMSC-020, ¶¶ 41-42.

**B.      The Scope of the *Noerr-Pennington* Doctrine**

{28}     In the current appeal, the district court and the Court of Appeals assumed that *Cordova*'s heightened pleading standard applied to The New Mexican's counterclaims against PNM. *N.M. Pub. Regul. Comm'n*, A-1-CA-38898, dec. ¶ 5.

19

PNM also appears to assume *Cordova* broadly extends the *Noerr-Pennington* doctrine to shield defendants from all claims based on the defendant's use of process, like filing a motion to intervene or an application for injunctive relief. We disagree with these assumptions. *Cordova* holds that conduct that would be protected under *Noerr-Pennington* is also shielded from retaliatory state court litigation unless that conduct is shown to be a sham; however, the recall activities at issue in *Cordova* clearly fell within the scope of the *Noerr-Pennington* doctrine. *Cordova*, 2017-NMSC-020, ¶ 26. *Cordova* did not consider what conduct qualifies for *Noerr-Pennington* protections in the first instance. We therefore consider, as a threshold matter, whether PNM's conduct qualifies for immunity under *Noerr-Pennington* to determine whether *Cordova*'s heightened pleading standard applies to The New Mexican's counterclaims.

{29}	Unfortunately for purposes of our analysis, the United States Supreme Court has not clearly settled the scope of the *Noerr-Pennington* doctrine. The primary weight of authority, to which we adhere, suggests that *Noerr-Pennington* only shields conduct aimed at influencing government decisionmaking or action. *See Noerr*, 365 U.S. at 138 ("[W]e think it clear that the Sherman Act does not apply to . . . mere solicitation of governmental action with respect to the passage and enforcement of laws."); *Pennington*, 381 U.S. at 670 (noting that *Noerr* applies to

20

"a concerted effort to influence public officials"); *Cantor v. The Detroit Edison Co.*, 428 U.S. 579, 601 (1976) ("The holding in *Noerr* was that the concerted activities of the railroad defendants in opposing legislation favorable to the plaintiff motor carriers was not prohibited by the Sherman Act."); *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499-500 (1988) (explaining that *Noerr-Pennington* immunity depends "on the source, context, and nature of the anticompetitive restraint at issue. . . . [T]he restraint cannot form the basis for antitrust liability if it is 'incidental' to a valid effort to influence governmental action" (citations omitted)); *Omni Outdoor*, 499 U.S. at 379-80; *Octane Fitness*, 572 U.S. at 555-56 ("Under the *Noerr-Pennington* doctrine . . . defendants are immune from antitrust liability for engaging in conduct (including litigation) aimed at influencing decisionmaking by the government."). Under this view, the *Noerr-Pennington* doctrine only applies to conduct that can be fairly characterized as public participation—conduct such as political campaigning, lobbying, or litigation asking the government to recognize or enforce public rights.

{30}     We are mindful, however, that *Cal. Motor* more broadly recognizes, "[t]he right of access to the courts is indeed but one aspect of the right of petition." 404 U.S. at 509. Later opinions from the United States Supreme Court similarly acknowledge that the petition clause may support a more general right of court access. *See Bill*

21

*Johnson's Rests., Inc. v. NLRB.*, 461 U.S. 731, 737, 741-43 (1983) (explaining that the First Amendment right to petition counsels against permitting the National Labor Relations Board from enjoining a "well-founded" lawsuit brought by an employer against its employees); *BE & K Constr. Co. v. NLRB.*, 536 U.S. 516, 525 (2002) (noting that *Cal. Motor* "made explicit that the right to petition extends to all departments of the Government, and that the right of access to the courts is but one aspect of the right of petition" (ellipsis, brackets, internal quotation marks, and citation omitted)). Based partly on this line of authority, we have also stated that the First Amendment provides a right of access to the courts. *See*, *e.g.*, *DeVaney*, 1998-NMSC-001, ¶ 19 ("Meaningful access to the courts is a right of fundamental importance in our system of justice."); *Jiron v. Mahlab*, 1983-NMSC-022, ¶ 7, 99 N.M. 425, 659 P.2d 311 (citing *Cal. Motor* for the proposition "[t]he right of access to the courts is one aspect of the right to petition"); *accord Bd. of Educ. of Carlsbad Mun. Schs. v. Harrell*, 1994-NMSC-096, ¶ 31, 118 N.M. 470, 882 P.2d 511 ("The right of access to the courts is one aspect of the right to petition the government for redress of grievances, as guaranteed by the First Amendment to the U.S. Constitution."). In view of this wider right of court access, some commentators have alternatively suggested that *Noerr-Pennington* may more broadly shield all genuine litigation from a malicious abuse of process countersuit, even if that

litigation is not aimed at influencing governmental decisionmaking or action. *See, e.g.*, Timothy P. Getzoff, *Dazed and Confused In Colorado: The Relationship Among Malicious Prosecution, Abuse of Process, and the Noerr-Pennington Doctrine*, 67 U. Colo. L. Rev. 675, 688 (1996) (explaining that the scope of petitioning is unclear under *Noerr-Pennington*, as the doctrine, "[i]n the broadest sense . . . could cover all litigation, concerning both public and private disputes," but nevertheless arguing for a more limited application of the doctrine); Joseph B. Maher, *Survival of the Common Law Abuse of Process Tort in the Face of a Noerr-Pennington Defense*, 65 U. Chi. L. Rev. 627, 628-629 (1998) ("Today, the survival of the longstanding abuse of process tort appears threatened by the *Noerr-Pennington* doctrine."). Under this alternative view of the *Noerr-Pennington* doctrine, the doctrine broadly immunizes all defendants from claims based on the defendant's use of process unless the defendant's conduct is a sham.

{31}    Thus, the scope of the *Noerr-Pennington* doctrine remains unsettled: According to the primary weight of authority, the doctrine only protects a limited category of conduct seeking to influence governmental decisionmaking or action; yet according to an alternative view, the doctrine more broadly protects all conduct arguably characterized as petitioning, including the petitioning of a court to resolve a purely private dispute.

23

{32} However, this alternative view finds little support in the jurisprudence applying the *Noerr-Pennington* doctrine, as the United States Supreme Court has only applied *Noerr-Pennington* to protect conduct seeking to influence governmental decisionmaking or action. For example, in *Noerr*, the activity protected by the First Amendment right to petition amounted to a publicity campaign designed to influence legislation. 365 U.S. at 130-34. In *Pennington*, the protected conduct included the lobbying of executive branch officials. 381 U.S. at 669-70. In *Cal. Motor*, the protected conduct involved a motor carrier's use of "the channels and procedures of state and federal agencies and courts" to influence an agency's decision on a competitor's operating rights applications. 404 U.S. at 509, 511. And in *Omni Outdoor*, the protected conduct included a billboard company's lobbying of local zoning officials. 499 U.S. at 367-68. The protected conduct in each of these cases was essentially political in nature, asking the government to either act, withhold action, or decide public issues that affected the parties' interests. None of these matters involved a dispute between private parties over private rights in which the government was only involved as an adjudicator.

{33} Similarly, the United States Supreme Court has deemed *Noerr-Pennington* to be inapplicable in the context of purely commercial or private litigation. In *Cantor*, 428 U.S. at 581-82, 601-02, the United States Supreme Court did not apply *Noerr-*

*Pennington* to protect a utility company from an antitrust suit brought by a pharmacist concerning the utility's free distribution of light bulbs, which allegedly harmed local light bulb retailers. Although the utility's program had been reviewed by a regulatory commission, the program itself did not "implement any statewide policy relating to light bulbs." *Id.* at 585. The *Cantor* Court distinguished *Noerr*, holding that the commission's approval of the utility's program was not "a sufficient reason for conferring antitrust immunity on the proposed conduct." *Id.* at 602.

{34}   In *Allied Tube*, the Supreme Court held that a steel conduit manufacturer's manipulation of a private industry standards-setting association was not immune from antitrust liability under the *Noerr-Pennington* doctrine. 486 U.S. at 496-97, 501-02. The manufacturer in *Allied Tube* had infiltrated an industry association's annual meeting with individuals who had been recruited to vote against a competitor's proposal. *Id.* In examining whether *Noerr-Pennington* shielded the manufacturer's conduct, the *Allied Tube* Court explained that the scope of *Noerr-Pennington* protection depended "on the source, context, and nature of the anticompetitive restraint at issue . . . where, independent of any government action, the anticompetitive restraint results directly from private action, the restraint cannot form the basis for antitrust liability if it is 'incidental' to a valid effort to influence governmental action." *Id.* at 499 (citations omitted). Although the industry

association's standards were widely adopted by state and local governments in building codes, the industry association could not "be treated as a 'quasi-legislative' body," and "no official authority ha[d] been conferred on it by any government." *Id.* at 501. Thus, the manufacturer's conduct was not directly aimed at influencing government officials.

{35}   The *Allied Tube* Court nevertheless recognized that the industry association's standards indirectly influenced state and local governments who would adopt the association's standards. Yet the *Allied Tube* Court still distinguished the manufacturer's conduct from the protected conduct in *Noerr*. *Id.* at 506-07. The *Allied Tube* Court explained that the lobbying activities in *Noerr* were immunized from antitrust liability because of their "political context and nature." *Id.* at 506. In contrast, the *Allied Tube* manufacturer's attempts to influence the industry association were "more aptly [] characterized as commercial activity with a political impact." *Id.* at 507. "Just as the antitrust laws should not regulate political activities simply because those activities have a commercial impact, so the antitrust laws should not necessarily immunize what are in essence commercial activities simply because they have a political impact." *Id.* (internal quotation marks and citation omitted). The Supreme Court's conclusion that the *Noerr-Pennington* doctrine did

26

not apply to the disputes in *Cantor* and *Allied Tube* thus confirms that the *Noerr-Pennington* doctrine does not apply to purely private disputes.

{36} Outside of the antitrust context, the petition clause has been understood to secure the right of the people to "communicate their will through direct petitions to the legislature and government officials." *McDonald v. Smith*, 472 U.S. 479, 482-83 (1985) (internal quotation marks and citation omitted). The petition clause has therefore protected all sorts of political activity, including litigation, seeking to influence governmental decisionmaking or action. For example, in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 914 (1982), the Supreme Court compared a political boycott seeking "to vindicate rights of equality and of freedom" to the protected conduct in *Noerr* because "a major purpose of the boycott in this case was to influence governmental action." *See also NAACP v. Button*, 371 U.S. 415, 429 (1963) ("In the context of NAACP objectives, litigation is not a technique of resolving private differences; it is a means for achieving the lawful objectives of equality of treatment by all government . . . It is thus a form of political expression."). Similarly, in *Bill Johnson's Rests.*, 461 U.S. at 741-42, the Supreme Court applied the petition clause to constrain governmental action, explaining that the National Labor Relations Board (NLRB) must be sensitive to an employer's right of petition when considering whether to enjoin state court litigation related to a labor

27

dispute. And in *BE & K Constr.*, 536 U.S. at 520-23, 536-37, the Supreme Court relied on First Amendment principles to invalidate an NLRB regulation that permitted the agency to penalize an employer's unsuccessful, but reasonably based lawsuit against several unions. While the underlying protected conduct in each of these cases involved litigation between private parties, the litigation nevertheless implicated important public issues and indirectly or directly influenced government action on these issues.

{37} Our review of Supreme Court jurisprudence therefore confirms that the *Noerr-Pennington* doctrine only shields conduct which essentially amounts to political activity in that the conduct seeks to influence governmental decisionmaking or action. Thus, while we acknowledge that *Cal. Motor*, 404 U.S. at 510, states, "[t]he right of access to the courts is indeed but one aspect of the right of petition," we read this statement in context as simply affirming that the right of petition also extends to the courts. We do not read *Cal. Motor* as eliminating the core prerequisite of the *Noerr-Pennington* doctrine, namely, that the doctrine applies to "solicitation of governmental action." *Noerr*, 365 U.S. at 138; *accord Pennington*, 381 U.S. at 669 (characterizing *Noerr* as "entirely" addressing "activities of competitors seeking to influence public officials"). Thus, we adhere to the primary view of the *Noerr-*

28

*Pennington* doctrine as immunizing "political activity" under the First Amendment right to petition, "not business activity." *Noerr*, 365 U.S. at 137.

**C.    Applicability of *Cordova*'s Heightened Pleading Standard**

{38}    In light of the preceding analysis, we conclude that the *Noerr-Pennington* doctrine protects conduct, including litigation, aimed at influencing governmental decisionmaking or action. *Noerr*, 365 U.S. at 137-38; *Pennington*, 381 U.S. at 669. We acknowledge that the scope of the *Noerr-Pennington* doctrine has not been settled by the United States Supreme Court, and we leave to that Court the task of clarifying the doctrine's scope. However, we need not resolve any doctrinal uncertainty to dispose of the question presented in this appeal. The United States Supreme Court has not extended *Noerr-Pennington* to state court litigation. Our opinion in *Cordova* extended the doctrine to our courts to effectuate the procedural protections of the Anti-SLAPP statute and to provide a "mechanism that offers [defendants] the substantive First Amendment protections they seek." *Cordova*, 2017-NMSC-020, ¶ 24. As such, to resolve whether The New Mexican was required to meet *Cordova*'s heightened pleading standard, we need only construe *Cordova* to see how this Court understood the scope of the *Noerr-Pennington* doctrine when we extended the doctrine's protections to our courts.

29

{39}     And a plain reading of *Cordova* supports our doctrinal view: *Cordova* states that a defendant is entitled to *Noerr-Pennington* immunity when the defendant's conduct was "aimed at influencing the government." *Id.* The recall activities at issue in *Cordova* exemplify the type of conduct that is contemplated within that description: an effort by a group of citizens asking the government to remove a school board member from office. *Id.* ¶¶ 3-4. The citizens' conduct in *Cordova* fell within the scope of the *Noerr-Pennington* doctrine because the recall activities amounted to "public participation" in a political cause. *Id.* ¶¶ 18, 23. *Cordova* did not contemplate that other conduct, not amounting to "public participation," *id.*, would qualify for *Noerr-Pennington* protections. Rather, *Cordova* viewed the substantive protections provided by *Noerr-Pennington* as a counterpart to the procedural protections provided by the Anti-SLAPP statute.[3] *See id.* ¶ 24 ("While the Anti-SLAPP statute provides the procedural protections [defendants] require, the *Noerr-Pennington* doctrine is the mechanism that offers [defendants] the substantive First Amendment protections they seek.").

---

[3]Although *Cordova* decided to impose a heightened pleading standard "in furtherance of the policy upon which the Anti-SLAPP statute is based," *Cordova* did not equate eligibility for *Noerr-Pennington* immunity with eligibility for the procedural protections of the Anti-SLAPP statute. 2017-NMSC-020, ¶ 30. A defendant may be entitled to *Noerr-Pennington* protections even if the defendant does not qualify under Section 38-2-9.1(A) for a special motion to dismiss.

{40}     It is likewise telling that *Cordova* did not overrule or address our previous discussion of the *Noerr-Pennington* doctrine in *DeVaney*, 1998-NMSC-001, ¶ 19 n.1. In *DeVaney*, we combined the common law torts of malicious prosecution and abuse of process into a single tort of malicious abuse of process. *Id.* ¶ 17. The *DeVaney* Court recognized, "[m]eaningful access to the courts is a right of fundamental importance in our system of justice," and noted that torts for malicious abuse of process are disfavored "[b]ecause of the potential chilling effect on the right of access to the courts." *Id.* ¶ 19. Therefore, the tort of malicious abuse of process must balance "the interest in protecting litigants' right of access to the courts and the interest in protecting citizens from unfounded or illegitimate applications of the power of the state through the misuse of the courts." *Id.* ¶ 14. In a footnote, the *DeVaney* Court further acknowledged, "the importance of the right to petition, and the potential chilling effect of tort liability, has caused the courts of some states to apply the more stringent requirements of the *Noerr-Pennington* doctrine to actions for malicious prosecution and abuse of process." *Id.* ¶ 19 n.1. (citations omitted). However, *DeVaney* did not apply *Noerr-Pennington* to the tort and instead narrowly defined the elements of malicious abuse of process to "protect the right of access to the courts." *Id.* ¶ 19.

31

{41} We further refined the elements of malicious abuse of process in *Fleetwood*, 2007-NMSC-047, ¶ 20, and in *Durham*, 2009-NMSC-007, ¶ 29, emphasizing in both opinions that the tort should be construed narrowly to protect the right of access to the courts. As currently stated, a malicious abuse of process claim requires the plaintiff to prove "(1) the use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge; (2) a primary motive in the use of process to accomplish an illegitimate end; and (3) damages." *Durham*, 2009-NMSC-007, ¶ 29; *accord* UJI 13-1636 NMRA. "An improper use of process may be shown by (1) filing a complaint without probable cause, or (2) an irregularity or impropriety suggesting extortion, delay, or harassment, or other conduct formerly actionable under the tort of abuse of process." *Durham*, 2009-NMSC-007, ¶ 29 (brackets, internal quotation marks, and citation omitted). If a malicious abuse of process claim is premised on a lack of probable cause, then the plaintiff must show that the defendant lacked "the reasonable belief, founded on known facts established after a reasonable pre-filing investigation, that a claim can be established to the satisfaction of a court or jury." *DeVaney*, 1998-NMSC-001, ¶ 22 (citation omitted); *accord* UJI 13-1639 NMRA. *DeVaney*'s probable cause standard is more lenient than the sham exception to *Noerr-Pennington*, as the *Noerr-Pennington* doctrine requires the protected conduct be "objectively baseless in the

32

sense that no reasonable litigant could realistically expect success on the merits." *Cordova*, 2017-NMSC-020, ¶ 28 (internal quotation marks and citation omitted). Yet *DeVaney*'s standard adequately addresses any concerns about chilling the right of court access through malicious abuse of process claims falling outside of *Noerr-Pennington*'s rubric.

{42} We thus understand our opinions in *Cordova* and *DeVaney* and its progeny to operate harmoniously. *DeVaney*, *Fleetwood*, and *Durham* set forth the elements of malicious abuse of process and emphasize that the tort should be construed "with an eye toward protecting honest litigants." *Fleetwood*, 2007-NMSC-047, ¶ 20. *Cordova*, on the other hand, imposes a heightened pleading standard for a specific category of claims challenging conduct that would be protected under the *Noerr-Pennington* doctrine. *Cordova*, 2017-NMSC-020, ¶ 30. And, as explained above, we conclude that *Noerr-Pennington* protects conduct seeking to influence governmental decisionmaking or action. *Id.* ¶ 24.

{43} We also note that *Cordova*'s decision to impose a heightened pleading standard on claims implicating the right to petition was inspired by the Colorado Supreme Court's opinion in *Protect Our Mountain Env't*, 677 P.2d at 1368-69. Subsequent to *Protect Our Mountain Env't*, but prior to *Cordova*, the Colorado Supreme Court clarified that its heightened pleading standard is "inapplicable to a

33

resort to administrative or judicial process implicating purely private disputes." *Boyer v. Health Grades, Inc.*, 2015 CO 40, ¶ 15, 359 P.3d 25; *accord Gen. Steel Domestic Sales, LLC v. Bacheller*, 2012 CO 68, ¶ 32, 291 P.3d 1 (holding that *Protect Our Mountain Env't*'s heightened pleading standard is inapplicable to arbitration involving a purely private dispute). Although the *Boyer* Court acknowledged the uncertainty surrounding the scope of the *Noerr-Pennington* doctrine, the Colorado Supreme Court nevertheless agreed "that a distinction between the resort to legal process implicating purely private disputes and the resort to legal process implicating matters of public concern is one that comports with Supreme Court usage." 2015 CO 40, ¶ 15. Thus, the *Boyer* Court held that two employees asserting an abuse of process claim against their former employer were not required to meet *Protect Our Mountain Env't*'s heightened pleading standard. *Boyer*, 2015 CO 40, ¶¶ 4, 15-16. We agree with the Colorado Supreme Court on the scope of the *Noerr-Pennington* doctrine and corresponding necessity for a heightened pleading standard.

{44} We therefore hold that *Cordova*'s heightened pleading standard only applies to complaints challenging conduct, including litigation, aimed at influencing governmental decisionmaking or action. *Cordova*'s heightened pleading standard

34

does not apply to litigation between private parties, concerning only private interests, and asking only for the judiciary to adjudicate the dispute.

**D.    *Cordova* Does Not Apply to The New Mexican's Counterclaims**

{45}    We next apply our holding to The New Mexican's counterclaims against PNM. On review of the record, it is clear that PNM's conduct in intervening in the PRC's lawsuit against The New Mexican and the filing of an application for an injunction was not aimed at influencing governmental decisionmaking or action. In fact, the PRC had already sued The New Mexican when PNM moved to intervene in the suit; thus, any action that PNM wished to solicit from the PRC had already been taken. By intervening, PNM sought to protect its private interests by enjoining The New Mexican from publishing its alleged trade secrets and recovering costs and fees related to the dispute. This conduct does not qualify for *Noerr-Pennington* protections as contemplated by *Cordova*.

{46}    Indeed, PNM admitted to the private nature of its dispute with The New Mexican in its motion to intervene. "Under Rule 1–024(A)(2), an applicant seeking to intervene as a matter of right must file a timely application, and satisfy a three-part test showing that (1) the applicant has an interest in the subject matter of the action; (2) protection of the applicant's interest may be impaired or impeded by disposition of the action; and (3) the interest sought to be protected is not adequately

35

represented by existing parties." *Chino Mines Co. v. Del Curto*, 1992-NMCA-108, ¶ 7, 114 N.M. 521, 842 P.2d 738 (citation omitted). In its motion to intervene, PNM asserted that the documents released to The New Mexican were "confidential business information and trade secrets belonging to PNM and its coal suppliers," and that its private interests were not adequately represented in the suit because the PRC was "a governmental entity . . . charged with representing the public interest, and that interest does not always align with the interests of a movant for intervention." Thus, PNM admitted that any potential public interests involved in the lawsuit were already adequately represented by the PRC. *See N.M. Right to Choose/NARAL v. Johnson*, 1999-NMSC-005, ¶¶ 19-20, 126 N.M. 788, 975 P.2d 841 (noting that when the government is "a party to an action and the interest the applicant seeks to protect is represented by a governmental entity, a presumption of adequate representation exists" (internal quotation marks and citation omitted)).

{47}    And to the extent PNM's oral argument presented the Court with other avenues to conclude that its conduct was aimed at influencing the government, we remain unpersuaded. For example, PNM suggested to the Court that its conduct was aimed at influencing the government because PNM's involvement in the litigation involved exposure of certain documents PNM believed to be confidential as well as what it perceived to be "an important public matter, which had to do with the

abandonment of the San Juan Generating Station." But PNM's attempts to recover documents from a private party that it believed to be confidential has little if any influence upon the government itself. Nor does resolution of the allegedly inadvertent disclosure have a material impact upon PNM's attempt to abandon certain portions of the San Juan Generating Station.

{48}     PNM's lawsuit against The New Mexican is purely a private dispute between private parties, and PNM seeks no more than for the judiciary to resolve this dispute. We therefore conclude that PNM's conduct does not qualify as *Noerr-Pennington* protected conduct under our decision in *Cordova*, 2017-NMSC-020, ¶¶ 24-26. Accordingly, The New Mexican was not required to meet *Cordova*'s heightened pleading standard in asserting counterclaims challenging PNM's conduct. The district court and Court of Appeals erred by applying *Cordova*'s heightened pleading standard to The New Mexican's counterclaims.

{49}     Because the district court dismissed The New Mexican's counterclaims based solely on its conclusion that The New Mexican had not met *Cordova*'s heightened pleading standard, we have no occasion to otherwise consider the sufficiency of The New Mexican's counterclaims. Nevertheless, we take this opportunity to address an error in the district court's reasoning lest this error cause confusion on remand.

{50}     The district court relied upon the intervention rule outlined in *Richins v. Mayfield*, 1973-NMSC-099, 85 N.M. 578, 314 P.2d 854, to conclude that, "[b]y its Order allowing intervention, the [district court] necessarily found that PNM . . . had a legitimate interest to protect." The district court's reliance on *Richins* is misplaced. *Richins* provides that, in order to allow a party to intervene in a finally adjudicated proceeding, a district court "must find that the right or interest cannot otherwise be protected, except by intervention." *Id.* ¶ 7. The intervention rule in *Richins* only applies when a court is assessing whether to allow a party to intervene "after a final judgment or decree has been entered," not at the pleadings stage, as was the case here. *Id.* ¶ 6; *accord Ruybalid v. Segura*, 1988-NMCA-084, ¶ 15, 107 N.M. 660, 763 P.2d 369. Rather, at the beginning of a lawsuit a district court may consider, but is not required to rule on the merits of a proposed intervenor's complaint. *Solon v. WEK Drilling Co., Inc.*, 1992-NMSC-023, ¶ 5, 113 N.M. 566, 829 P.2d 645. The grant of a motion to intervene under Rule 1-024 NMRA prior to final adjudication does not establish that a party has either an objectively reasonable basis or probable cause for the proceeding. Accordingly, the district court's granting of PNM's motion to intervene did not establish as a matter of law that PNM had a legitimate claim. The district court erred by concluding otherwise.

## V.  CONCLUSION

{51}  The district court and the Court of Appeals erred by concluding that The New Mexican's counterclaims against PNM should be dismissed for failure to meet *Cordova*'s heightened pleading standard. *Cordova* only requires a plaintiff to meet this heightened pleading standard if the defendant's conduct was aimed at influencing governmental decisionmaking or action. PNM's conduct was not aimed at influencing the government and thus *Cordova*'s heightened pleading standard did not apply to The New Mexican's counterclaims. We reverse and remand this matter to the district court with instructions to vacate its order dismissing The New Mexican's counterclaims and the final judgment entered in favor of PNM.

{52}  **IT IS SO ORDERED.**

_____
**JULIE J. VARGAS, Justice**

**WE CONCUR:**

_____

**MICHAEL E. VIGIL, Justice**


_____

**C. SHANNON BACON, Justice**


_____

**BRIANA H. ZAMORA, Justice**


_____

**DREW D. TATUM, Judge**
**Sitting by designation**